Filed 6/22/17  Certified for Partial Pub. 7/17/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KATHLEEN S. SWIGART,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CARL BRUNO,<br><br>    Defendant and Appellant. | D071072<br><br>(Super. Ct. No. RIC1304282) |

APPEALS from a judgment and a postjudgment order of the Superior Court of Riverside County, John W. Vineyard, Judge.  Judgment and postjudgment order affirmed.

The Law Office of John Derrick and John Derrick for Plaintiff and Appellant.

Selman Breitman, Elaine K. Fresch, Rachel E. Hobbs and Melanie M. Smith for Defendant and Appellant.

Plaintiff Kathleen S. Swigart and defendant Carl Bruno participated in an organized endurance horseback riding event in Perris, together with approximately 47 other riders.  Somewhat less than two hours into the 50-mile course, seven riders,

including Swigart and Bruno, were stopping together, single-file, on the trail. Swigart was in the lead and had dismounted at a required checkpoint along the course. Although the evidence is in dispute as to exactly what happened at this point, there is no dispute that Bruno's horse struck Swigart while she was standing on the ground, injuring her. Swigart sued Bruno, alleging causes of action for negligence, reckless or intentional misconduct, and having an animal with a dangerous propensity.

The trial court granted Bruno's motion for summary judgment. After independently reviewing the record, we conclude that the doctrine of primary assumption of risk bars Swigart's cause of action for negligence, and that Swigart did not meet her burden of establishing a genuine issue of material fact as to Bruno's alleged recklessness or Bruno's horse's alleged propensity for danger. Accordingly, we affirm the judgment.

In postjudgment proceedings, Swigart moved to tax certain of Bruno's costs. Bruno appeals from the portion of the trial court's postjudgment order granting the motion in part and taxing $1,962.50 in costs. By not including a complete copy of the order on appeal, Bruno failed to meet his burden of establishing error. In addition, based on what he did present, Bruno failed to meet his burden of establishing that the trial court abused its discretion in taxing $1,962.50 in costs. Accordingly, we affirm the postjudgment order.

I.

FACTUAL BACKGROUND[1]

" 'Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion.' " (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717.)  We consider all the evidence in the moving and opposing papers, except evidence to which objections were made and sustained,[2] liberally construing and reasonably deducing inferences from Swigart's evidence, and resolving any doubts in the evidence in Swigart's favor.  (*Wilson*, at p. 717; Code Civ. Proc., § 437c, subd. (c).)

The American Endurance Ride Conference (AERC) is a national governing and record-keeping body for "long distance horse riding."  Endurance rides conducted under

---

[1]     In this part of the opinion, we will describe generally what happened.  In part III., *post*, we will supplement these facts as necessary to the discussion of particular issues.

[2]     In his respondent's brief, Bruno cites to evidence as to which the trial court sustained Swigart's objections.  We have disregarded all such references in his brief.

We further disapprove of Bruno's counsel's blatant violation of California Rules of Court, rule 8.204(c)(1), (4), which limits his principal briefs to a total of 28,000 words.  Bruno's combined principal briefs are 133 pages and contain 27,952 words.  (*Ibid.*)  However, *throughout the 133 pages*, counsel intentionally omitted spaces and inserted slashes (/) in case and record citations, apparently so that the word processing program would consider each multi-word citation as one word.  For example, by citing "1Supp.CT/57,2Supp.CT/492-496," counsel has misrepresented that this record reference is one word rather than eight; and by citing "*Martinez,supra,*56Cal.4th/1014, and "(1998)198Cal.App.3d/1225,1240," counsel has misrepresented that these case citations are each one word rather than five.  Accordingly, because Bruno's principal briefs contain more than 28,000 total words, the briefs are noncompliant for purposes of California Rules of Court, rule 8.204.  We decline to strike them on our own motion (*id.*, rule 8.204(e)(2)(B)) *only* because we do not want to further delay disposition of this appeal.

3

the AERC's Endurance Rider's Handbook are run over a premarked, premeasured trail, with designated stops for horses to be examined by a veterinarian. The winner of an endurance ride is the rider and horse team that successfully completes the course in the fastest time, provided that the horse passes a final control examination conducted by a veterinarian. The AERC describes endurance riding as " 'a highly competitive and demanding sport.' " The AERC Ride Manager's Handbook describes endurance riding as both a " 'sports activity' " and an " 'equestrian athletic event.' "

Bruno's horse injured Swigart during an endurance ride that took place on March 3, 2012, at the Bar H Ranch and adjacent land in Perris (the Ride). Including Swigart and Bruno, there were approximately 49 riders who participated in the event — either 25 miles or 50 miles, at the option of the individual rider. The riders followed a specific course, collecting playing cards at set checkpoints along the route to verify having completed the entire course before crossing the finish line.

At the time of the Ride, both Swigart and Bruno had extensive experience with endurance riding. Swigart was a professional horse trainer at the Bar H Ranch and had been participating and winning prizes in, and even acting as the ride manager for, endurance riding events since 1991. Bruno had owned approximately 30 to 35 horses since 1982, had bred horses from 1994 to 2000, had trained endurance horses from 1994 to 2012, had entered approximately 148 endurance riding events and had won prizes.

Until Swigart's injury, Swigart and Bruno had spent most of the Ride with the lead group of approximately seven riders.[3]  Less than two hours into the Ride, as the group approached the second card stop at the eight-mile checkpoint, the seven horses were close together in a single line — with Swigart in front, Bruno in the rear and Diane Stevens immediately in front of Bruno.  At the checkpoint, Swigart dismounted to retrieve cards for all of the riders in the group, as Stevens and Bruno were slowing down from behind.  In the process of retrieving the cards, Bruno's horse bumped the rear of Stevens's horse, Stevens's horse kicked Bruno's horse, Bruno was thrown from his horse, and Bruno's horse bolted to the left of Stevens's horse, sideswiping two horses ahead and striking Swigart, who was still standing on the ground.[4]

## II.

## PROCEDURAL BACKGROUND

Swigart filed the underlying complaint against Bruno, alleging causes of action for reckless or intentional misconduct, negligence and having an animal with a dangerous

---

[3]    Before participating in the Ride, Swigart signed a one-page "Release of Liability" and a one-page "Agreement and Release of Liability."  Because we decide the appeal from the judgment based on issues unrelated to either of these releases, we do not discuss their contents or their potential effect on the outcome of the appeal.

[4]    Stevens had a video camera attached to her helmet.  Swigart submitted a DVD that contains a recording of approximately 40 minutes of Stevens's ride with the group — ending with the injury to Swigart.  To the extent that Swigart's witnesses' testimony was inconsistent with the video, we do not consider such inconsistency a disputed fact and have relied on the evidence in the video.

5

propensity. Following discovery, Bruno filed a motion for summary judgment or, in the alternative, for summary adjudication, and Swigart opposed the motion.

The trial court issued a tentative ruling granting Bruno's motion. The parties requested oral argument, and at the conclusion of the hearing the court confirmed the tentative ruling. In the related minute order, the court granted Bruno's motion for summary judgment; granted in part and denied in part Bruno's request for judicial notice and each party's respective evidentiary objections; and directed Bruno to prepare a formal order and judgment. The court later filed a written order granting Bruno's motion for summary judgment, ruling in relevant part that the primary assumption of risk doctrine barred Swigart's negligence cause of action and that Swigart had not met her burden of establishing a triable issue of material fact as to gross negligence.[5]

The trial court filed a judgment in favor of Bruno and against Swigart, and Swigart timely appealed.

In postjudgment proceedings, Bruno filed a memorandum of costs in the amount of $45,694.71. Swigart filed a motion to tax $31,891.56 of the costs claimed. Bruno opposed the motion, and Swigart replied to Bruno's opposition. The day before the hearing, in response to Swigart's reply, Bruno lodged additional exhibits.

At the hearing on Swigart's motion, following the argument of counsel, the trial court sustained Swigart's objection to Bruno's late-filed evidence, confirmed its tentative

---

[5] The order did not mention Swigart's claims for reckless or intentional misconduct or for having an animal with a dangerous propensity.

6

ruling and continued the hearing for two weeks to give counsel time to determine whether they could agree on a written order; if they could not agree, they were to appear in court in two weeks to finalize the order. Counsel agreed to an order, which the court approved and filed without a further hearing. The order provides in relevant part that "the court issued a tentative ruling (copy attached) which became the final ruling of the court after hearing oral argument." We infer from the order that the tentative ruling granted the motion in part and taxed certain items, and we know from the order that counsel met and conferred and agreed that $1,962.50 was a reasonable amount of costs to be taxed for Bruno's attempt to locate a potential witness.[6] Bruno timely appealed from this postjudgment order.[7]

## III.

## DISCUSSION

Because the trial court's judgment and postjudgment order are both " '*presumed correct*,' " Swigart has the burden of establishing reversible error as to the judgment, and Bruno has the burden of establishing reversible error as to the postjudgment order.

---

[6] The parties agreed to tax an additional $11,813.87 in costs, and there are no issues on appeal as to those costs. We observe that the sum of the costs that the parties agreed should be taxed ($13,776.37) is $38 more than the "Total" stated in the order ($13,738.37).

[7] In designating the record on appeal, Bruno did not include the court's tentative ruling; in confirming its tentative ruling at the hearing on Bruno's motion, the court did not state what its tentative ruling was; and the clerk's transcript does not contain a copy of the postjudgment order that has an attached copy of the tentative ruling.

(*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) Neither has met this burden.

Because the issues in Swigart's appeal from the judgment and Bruno's appeal from the postjudgment order are entirely independent, we will address each independently.

A.  *Swigart's Appeal from the Judgment*

We review de novo the summary judgment ruling in this appeal. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*); *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 (*Kahn*) [appeal from grant of defense summary judgment based on primary assumption of the risk].) As a practical matter, " 'we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment.' " (*Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113, 1124.)

A defendant is entitled to a summary judgment on the basis that the "action has no merit" (Code Civ. Proc., § 437c, subd. (a)) only where the court is able to determine from the evidence presented that "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (*id.* subd. (c)). A cause of action "has no merit" if, as a matter of law, one or more of the elements of the cause of action cannot be established, or an affirmative defense to the cause of action can be established. (*Id.*, subd. (o).)

Thus, the defendant has the ultimate burden of *persuasion* that one or more elements of the cause of action at issue "cannot be established" or that "there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*,

8

*supra*, 25 Cal.4th at pp. 849, 850, 853-854.) In attempting to meet this burden, the defendant has the initial burden of *production* to make a prima facie showing of the nonexistence of any triable issue of material fact. (*Aguilar*, at p. 850.) If the defendant meets this burden, then the burden of *production* shifts to the plaintiff to establish the existence of a triable issue of material fact. (*Id.* at pp. 850-851.)

In this appeal from the grant of a defense summary judgment, therefore, we determine first whether Bruno's initial showing establishes an entitlement to judgment in his favor; if so, we then determine whether Swigart's responsive showing establishes a triable issue of material fact. (*Blackwell v. Vasilas* (2016) 244 Cal.App.4th 160, 168.)

> 1. *Primary Assumption of Risk Bars Swigart's Claims for Negligence*
>     a. *Law*

"Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . ." (Civ. Code, § 1714, subd. (a).) Stated differently, "each person has a duty to use ordinary care and 'is liable for injuries caused by his [or her] failure to exercise reasonable care in the circumstances.' " (*Parsons v. Crown Disposal Co*. (1997) 15 Cal.4th 456, 472, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 112.) "Duty, being a question of law, is particularly amenable to resolution by summary judgment." (*Parsons*, at p. 465.) Primary assumption of risk is a defense that relieves a defendant of any duty to the plaintiff when the plaintiff is injured due to a risk that is inherent in an activity in which

9

the plaintiff chose to participate.  (*Knight v. Jewett* (1992) 3 Cal.4th 296, 308 (*Knight*);[8]

*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1154 (*Nalwa*) [primary assumption of

the risk supported defense summary judgment].)

In *Knight*, *supra*, 3 Cal.4th 296, the Supreme Court considered the application of

the assumption of risk doctrine in light of the court's adoption of comparative fault

principles in *Li v. Yellow Cab Co*. (1975) 13 Cal.3d 804.  The court distinguished

between *primary* assumption of risk — i.e., "those instances in which the assumption of

risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the

defendant to protect the plaintiff from a particular risk" — and *secondary* assumption of

risk — i.e., "those instances in which the defendant does owe a duty of care to the

plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's

breach of that duty."[9]  (*Knight*, at p. 308.)  When applicable, primary assumption of risk

"operate[s] as a complete bar to the plaintiff's recovery."  (*Id.* at p. 315.)  In contrast,

when applicable, secondary assumption of risk "is merged into the comparative fault

---

[8]     Although *Knight* was a plurality opinion, "[a] majority of th[e] court has since
embraced the *Knight* approach."  (*Avila v. Citrus Community College Dist.* (2006) 38
Cal.4th 148, 161 (*Avila*).)

[9]     In comparison to primary and secondary assumption of risk, *express* assumption of
risk occurs when "as the result of an express agreement, the defendant owes no duty to
protect the plaintiff from an injury-causing risk."  (*Knight*, *supra*, 3 Cal.4th at p. 308,
fn. 4.)  Such an agreement relieves the defendant of a legal duty to the plaintiff
concerning the risks covered by the agreement and results in a complete bar to the
plaintiff's claim.  (*Ibid.*)

scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties." (*Ibid*.)

Primary assumption of the risk does not depend on whether the plaintiff subjectively appreciated the risks involved in the activity; instead, the focus is an objective one that takes into consideration the risks that are " 'inherent' " in the activity at issue. (*Knight*, *supra*, 3 Cal.4th at pp. 316-317.) Because "certain dangers are often integral" to the activity itself, defendants generally have no duty to protect a plaintiff from such risks. (*Nalwa*, *supra*, 55 Cal.4th at p. 1155.)

Primary assumption of the risk does not depend on whether the defendant is competing with or against the plaintiff; the doctrine also applies to coparticipants in the same activity. (*Shin v. Ahn* (2007) 42 Cal.4th 482, 494 (*Shin*) [social golf]; *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1068 (*Cheong*) [snow skiers on the same run].) "A coparticipant in an active sport ordinarily bears no liability for an injury resulting from conduct in the course of the sport that is merely careless or negligent." (*Ford v. Gouin* (1992) 3 Cal.4th 339, 342 [water skier injured by boat driver's alleged negligence].) Courts should not "hold a sports participant liable to a coparticipant for ordinary careless conduct committed during the sport," because "in the heat of an active sporting event . . . , a participant's normal energetic conduct often includes accidentally careless behavior. . . . . [V]igorous participation in such sporting events likely would be chilled if

11

legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct."[10] (*Knight*, *supra*, 3 Cal.4th at p. 318 [touch football].)

For these reasons, the general test is "that a participant in an active sport breaches a legal duty of care to other participants — i.e., engages in conduct that properly may subject him or her to financial liability — only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight*, *supra*, 3 Cal.4th at p. 320, quoted in *Cheong*, *supra*, 16 Cal.4th at p. 1068.) Although a defendant has no duty of care to a plaintiff with regard to inherent risks, a defendant still has a duty not to increase those risks. (*Shin*, *supra*, 42 Cal.4th at p. 486.)

In analyzing whether Bruno owed Swigart a duty at the Ride, we consider whether the risk of being struck by a coparticipant's horse that follows other horses so closely as to come into contact with them is " 'inherent in' " the activity of endurance riding.[11]

_____

[10] Although we have no difficulty concluding that endurance riding is a "sport" for purposes of assumption of the risk — and the parties do not argue otherwise — the doctrine applies to any recreational activity involving an inherent risk of injury to voluntary participants that cannot be eliminated without affecting the basic nature of the activity. (*Nalwa*, *supra*, 55 Cal.4th at p. 1156 [amusement park bumper cars].)

[11] The parties disagree as to whether the Ride was "an endurance riding *event*" (according to Swigart) or "an endurance riding" "*competition*" (according to Bruno). (Italics added.) For our purposes, this disagreement is a distinction without a difference: "For participation to fall within the primary assumption of risk category, the sporting activity in question need not be part of a competitive matchup." (*Shelly v. Stepp* (1998) 62 Cal.App.4th 1288, 1294 (*Shelly*) [*practice* for a horse race].) Accordingly, for our purposes, endurance riding is a sporting activity to which the affirmative defense of primary assumption of the risk applies upon a sufficient showing.

12

(*Nalwa*, *supra*, 55 Cal.4th at p. 1155; see *id.* at pp. 1156-1158; see generally *Knight*, *supra*, 3 Cal.4th at pp. 315-317.)  In determining whether a risk is inherent in an activity, we consider "the record and common sense."  (*Zipusch v. LA Workout, Inc.* (2007) 155 Cal.App.4th 1281, 1292.)

###### b.      *Analysis — Negligence*

Swigart argues that because she met her burden of presenting conflicting evidence as to what is inherent in the activity of endurance riding, the trial court erred in granting summary judgment.  We disagree.  Our review of the record on appeal — which includes the documentary evidence and the more than 40 minutes of video of the Ride — enables us to determine what is inherent in the activity of endurance riding.  Applying case law concerning horses,[12] as well as common sense, to the undisputed facts surrounding the Ride and Swigart's injury, we conclude that, as a matter of law, primary assumption of the risk bars Swigart's claim for negligence.

Swigart first directs us to testimony from her expert that endurance riding "is a non-contact sport or recreational activity."  The expert contrasted endurance riding with track races, emphasizing both that contact is "not integral" to endurance riding and that endurance riders are (or should have been) taught "to always maintain a safe distance

---

[12]    For purposes of applying primary assumption of the risk, we know that horses, "by their nature," are unpredictable and "difficult to control."  (*Shelly*, *supra*, 62 Cal.App.4th at pp. 1294-1295.)  There is always a risk that, merely by "behaving as a horse," a horse with its rider will cause injury.  (*Levinson v. Owens* (2009) 176 Cal.App.4th 1534, 1547, 1551 (*Levinson*) [social guest]; *Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578, 588 (*Harrold*) [commercial customer].)

behind the horse ahead."  From this evidence, Swigart argues that because Bruno's riding involved Bruno's horse having physical contact with other horses on various occasions during the eight miles prior to the accident — i.e., behavior not inherent to the activity — she did not assume the risk of an injury caused by contact.  We are not persuaded.  In *Avila*, *supra*, 38 Cal.4th 148, the Supreme Court ruled that even though a pitcher is "forbidden by the rules of baseball" from "intentionally throwing at a batter" (*id.* at p. 165), the possibility that a batter will be "*intentionally* hit" is an "inherent risk of the sport" (*id.* at p. 164).  Stated differently, a pitcher intentionally hurling a ball at a batter is as much an inherent risk in baseball as physical contact (e.g., rear-ending[13]) is in endurance riding; while neither may be encouraged — and, as in *Avila*, may even be prohibited — under the rules of the sport, each is nevertheless an inherent risk in its respective activity.[14]

Our conclusion that primary assumption of the risk applies in this case is consistent with the general statement in *Levinson*, *supra*, 176 Cal.App.4th at page 1546, that horseback riding is an "inherently dangerous sport" to which, as a general rule, "the

[13]     Swigart uses the term "rear-ending" for the behavior that Stevens described in her declaration as follows:  "[O]n about six different occasions Mr. Bruno's horse physically struck the rear end of my horse, bumping my horse forward in an amusement park bumper car ride fashion."

[14]     We are not required to credit the opinion of Swigart's expert.  Bruno had no duty to Swigart to avoid tailgating or rear-ending in an endurance event.  The fact that Swigart's expert may believe otherwise does not create a triable issue of material fact. The "question of the existence and scope of a defendant's duty of care is a *legal* question" "and is an issue to be decided by the court." (*Knight*, *supra*, 3 Cal.4th at p. 313; accord, *Avila*, *supra*, 38 Cal.4th at p. 161.)

14

principles of primary assumption of the risk apply."  If a social guest's horseback ride at a barbecue at a ranch is an inherently dangerous activity for purposes of primary assumption of the risk (*id.* at pp. 1537, 1536, 1545, 1551), then so too is a 25- or 50-mile endurance ride over challenging terrain at which the riders are timed as they complete the designated course.

Swigart's claim for negligence — which Swigart supports with evidence that Bruno was unable to control his horse, refused to heed safety warnings from coparticipants and continued to participate in the event after becoming aware of these safety risks — is premised primarily on evidence that Bruno's horse tailgated and rear-ended other horses.  Based on our review of Stevens's video, given the amount of tailgating by many of the riders in the first group in the Ride — *particularly* as the group approached the second card stop at the eight-mile checkpoint immediately before Swigart's injury — testimony that such behavior is not part of the sport of endurance riding simply is not credible.[15]  For example, on too many occasions to count, Stevens allowed her horse to tailgate, and even come up next to the rear of the horse in front of hers — despite the fact that the horse in front of hers wore a red ribbon in its tail, which, Stevens testified, is used by a rider "to designate a horse likely to kick on a trail ride."

---

[15]  Stevens also testified that when Bruno's horse crowded her horse, her horse "would lower its neck and head, pin his ears backwards and down onto the back of his head and frequently glance or look in a meaningful fashion toward his rear."  However, in the minutes and seconds preceding the point in time when Bruno's horse bolted to the left of Stevens's horse and struck Swigart, the head of Stevens's horse remained at the same level looking forward, and his ears were pointed straight up — just as they appeared throughout the video.

15

Swigart was injured by Bruno's horse, which bolted out of control as a group of seven horses in a single file line came to a stop in a narrow area. In the process of slowing down, Bruno's horse bumped the rear of Stevens's horse, Stevens's horse kicked Bruno's horse, Bruno was thrown from his horse, and Bruno's horse took off, sideswiping two horses ahead and striking Swigart, who was standing on the ground at a Ride checkpoint. Because this type of equine conduct is among the risks inherent in endurance riding, the assumption of the risk doctrine applies to Swigart's claims based on Bruno's alleged negligence. Accordingly, as a matter of law, Bruno did not owe Swigart a duty of due care to protect her from the risk of the harm that she suffered during the Ride.

As the *Levinson* court summarized, where the application of primary assumption of the risk results in " 'no duty' on the part of the defendant to protect the plaintiff from a particular risk" (*Knight*, *supra*, 3 Cal.4th at p. 308), a defendant like Bruno owes a plaintiff like Swigart only two duties: "(1) to not 'intentionally' injure the rider; and (2) to not 'increase the risk of harm beyond what is inherent in [horseback riding]' (*Kahn*, *supra*, 31 Cal.4th at p. 1004) by 'engag[ing] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport' (*Knight*, *supra*, 3 Cal.4th at p. 320)." (*Levinson*, *supra*, 176 Cal.App.4th at pp. 1545-1546.) Swigart does not argue on appeal that Bruno intentionally injured her. We discuss recklessness in part III.A.2., *post*.

16

2.     *Swigart Did Not Meet Her Burden of Establishing a Material Issue of Fact as to Her Claims for Gross Negligence and Recklessness*

In her second cause of action based on negligence, Swigart pleaded a claim for gross negligence.  In her first cause of action, Swigart also pleaded a claim for recklessness.

Ordinary negligence is "an unintentional tort[ and ]consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm."  (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 753-754.)  Gross negligence — which is not a distinct cause of action, but merely "a degree of negligence" (*Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 552, fn. 3) — requires a showing of "either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' "  (*City of Santa Barbara*, at p. 754.)  Recklessness "describes conduct by a person who may have no intent to cause harm, but who intentionally performs an act so unreasonable and dangerous that he or she knows or should know it is highly probable that harm will result."  (*Id.* at p. 754, fn. 4.)

Swigart tells us:  "There is no meaningful distinction — at least, *for the purposes of this appeal* — between [recklessness] and gross negligence."[16]  (Italics added.)  Bruno

---

16     In support of this statement, Swigart relies on dictum in a 1963 California opinion involving an automobile accident in which the Court of Appeal was discussing *Montana law*, quoting from a 1934 Montana Supreme Court opinion that interpreted a 1931 Montana statutory scheme.  (*Philpott v. Mitchell* (1963) 219 Cal.App.2d 244, 252, quoting from *Nangle v. Northern Pacific Ry. Co.* (Mont. 1934) 32 P.2d 11, 13-14 [applying Montana's Automobile Guest Act of 1931 (Laws 1931, ch. 195)].)  We express no opinion as to the accuracy of Swigart's statement under *California law*.

17

does not contend otherwise and, indeed, seems to agree. Swigart argues that the following facts should defeat summary judgment as to her claims based on recklessness and gross negligence: "Bruno was riding *recklessly* by repeatedly rear-ending other horses, knowing that this could cause one of them to react defensively. To go on doing this, even after being repeatedly warned by other riders not to do so, and with Bruno's experience in endurance riding, was *grossly negligent*." (Italics added.) Swigart contends that these facts are sufficient to demonstrate that Bruno increased the risk of harm beyond what is inherent in endurance riding by engaging in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in endurance riding. (See *Kahn*, *supra*, 31 Cal.4th at p. 1004; *Knight*, *supra*, 3 Cal.4th at p. 320).

When analyzing whether a defendant increased the risk of harm associated with an activity subject to the primary assumption of the risk doctrine, duties with respect to the same risk will vary according to "the *role* played by particular [persons] involved in the sport" (*Kahn*, *supra*, 31 Cal.4th at p. 1004)[17] and "the nature of the particular riding activity at issue" (*Levinson*, *supra*, 176 Cal.App.4th at p. 1546). Here, the persons involved in the sport were *coparticipants*, and the nature of the activity was a timed event where the riders who finished were told where they placed based on their times.

---

[17] "In the sport of baseball, for example, although the batter would not have a duty to avoid carelessly throwing the bat after getting a hit — vigorous deployment of a bat in the course of a game being an integral part of the sport — a stadium owner, because of his or her different relationship to the sport, may have a duty to take reasonable measures to protect spectators from carelessly thrown bats. For the stadium owner, reasonable steps may minimize the risk without altering the nature of the sport." (*Kahn*, *supra*, 31 Cal.4th at p. 1004, citing *Knight*, *supra*, 3 Cal.4th at p. 317.)

18

Significantly, during this timed event, there was tailgating by many of the horses in the first group, which included coparticipants Swigart and Bruno. On occasions too numerous to list by the recorded time on the video, as horses rode single-file, particularly on sloped terrain, they often tailgated the horse in front of them. Even if some of the tailgating may have resulted in contact, such action is not, in the words of *Knight*, *supra*, 3 Cal.4th at page 320, "so reckless as to be totally outside the range of the ordinary activity involved in [endurance riding]." To the contrary, because horses are "natur[ally]" unpredictable and "difficult to control" (*Shelly*, *supra*, 62 Cal.App.4th at pp. 1294-1295), where there is tailgating, contact cannot be deemed to be reckless.

Accordingly, Swigart did not meet her burden of establishing an issue of material fact as to whether Bruno's actions during the Ride increased the risk of harm beyond what is inherent in the sport of endurance horseback riding.

> 3. *Swigart Did Not Meet Her Burden of Establishing a Material Issue of Fact as to Her Strict Liability Claim*

"A common law strict liability cause of action may . . . be maintained if the owner of a domestic animal that . . . injures another person knew or had reason to know of the animal's vicious propensities." (*Priebe v. Nelson* (2006) 39 Cal.4th 1112, 1115; see CACI No. 462.) If the defendant knew or should have known of the animal's vicious propensities and failed to inform the plaintiff of such facts, then the defendant can be found liable for having exposed the plaintiff to an *unknown risk* and thereby can be held strictly liable for the plaintiff's injuries. (*Ibid.*) "Under such circumstances, the defense

of primary assumption of risk would not bar [the plaintiff's] claim since she could not be found to have assumed a risk of which she was unaware." (*Id.* at p. 1116.)

In her third cause of action, Swigart alleged a strict liability claim against Bruno for having a domestic animal with a dangerous propensity.[18]  More specifically, Swigart alleged that Bruno rode his dangerous horse into the area in which Swigart had dismounted and gone to collect the cards at the second stop, proximately causing her injuries.

Swigart argues that there is a triable issue of material fact "as to whether Bruno was aware of the *dangerous propensities* of his horse prior to the accident — both before the day of the accident and during the one-to-two hours of riding leading up to the accident." (Italics added.)  However, because we have concluded as a matter of law that that Bruno's horse's behavior — which, for purposes of Swigart's motion, includes tailgating and rear-ending — was not outside the range of the ordinary activity in endurance riding (see pt. III.A.2., *ante*), we further conclude that the propensities of Bruno's horse on which Swigart relies were not dangerous as a matter of law for purposes of Swigart's common law strict liability cause of action.

Because Bruno's horse merely " 'act[ed]' " or " 'behav[ed] as a horse' " (*Harrold*, *supra*, 19 Cal.App.4th at p. 588; see *Levinson*, *supra*, 176 Cal.App.4th at p. 1547),

_____

18     For purposes of analyzing this claim, we have assumed without deciding that Bruno's horse is a domestic animal.  Bruno does not contend otherwise.

20

Swigart did not meet her burden of establishing an issue of material fact as to whether Bruno's horse had vicious or dangerous propensities.

### 4. *The Judgment Is Affirmed*

Because the primary assumption of risk doctrine bars Swigart's claim for negligence and because the facts do not, as a matter of law, support claims for recklessness or gross negligence or for having an animal with a dangerous propensity, we affirm the judgment.[19]

### B. *Bruno's Appeal from the Postjudgment Order*

In her motion to tax costs, Swigart challenged almost $32,000 of the over $45,000 in costs claimed by Bruno. The trial court appears to have taxed five specific cost items that, based on the parties' agreement, totaled more than $13,700. All that remains at issue in Bruno's appeal from the court's postjudgment order is the taxing of $1,962.50 in costs that Bruno incurred in attempting to locate a witness, Grit Jones, whom Bruno contends Swigart identified in discovery responses.[20]

---

[19] In so doing, we do not reach — and, therefore, do not express an opinion regarding — issues related to Swigart's alleged release(s), Swigart's express assumption of risk, or what Bruno contends are errors in the trial court's evidentiary rulings.

[20] In his opening brief, Bruno argued that the trial court erred in taxing other costs, but after receiving Swigart's brief, Bruno acknowledged in reply that he was not entitled to any of the taxed costs other than the $1,962.50 item. Bruno claimed entitlement to this cost pursuant to Code of Civil Procedure section 1033.5, subdivision (a)(4)(B), which provides that, where other prerequisites are met and the prevailing party incurs expenses in attempting service of process by a registered process server, "the recoverable cost is the amount actually incurred in effecting service, including, but not limited to, a stakeout or other means employed in locating the person to be served, unless those charges are successfully challenged by a party to the action."

21

Bruno argues that, because the trial court did not expressly find that his costs of attempting to serve Jones were *unreasonable*, the court abused its discretion in disallowing the amount that Bruno claimed in his presumptively proper memorandum of costs.[21]

We conclude that, by not providing a sufficient record from which we are informed of the trial court's substantive ruling from which he appealed, Bruno has forfeited appellate review of the postjudgment order. In any event, even if we consider Bruno's argument, based on the limited record that Bruno supplied, he did not meet his burden of showing that the trial court abused its discretion in taxing the costs associated with attempting to locate potential witness Jones.

1. *Bruno Forfeited Appellate Review of the Postjudgment Order Taxing Costs*

Because the court's postjudgment order is " '*presumed correct*' " (*Denham*, *supra*, 2 Cal.3d at p. 564), Bruno, as the appellant, has the burden of overcoming this presumption by " 'provid[ing] an adequate record to assess error' " (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1141 (*Ketchum*)). This rule " 'is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham*, at p. 564.) "Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]." (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 (*Hernandez*); accord, *Ketchum*, at p. 1141.)

---

[21] Contrary to Bruno's implied argument, there is no requirement that a trial court make factual findings in ruling on a motion to tax costs. (*County of Kern v. Ginn* (1983) 146 Cal.App.3d 1107, 1110.)

Toward the conclusion of the hearing on Swigart's motion, the trial court orally ruled that it was going to confirm its tentative ruling. Consistently, the written order on appeal provides in relevant part: "After having reviewed the moving and opposing papers, the court issued a tentative ruling (*copy attached*) which became the final ruling of the court after hearing oral argument." (Italics added.)

Without a copy of the tentative ruling — either by itself or attached to the written order that incorporates it as the basis of the court's ruling — we do not know what findings or substantive rulings, if any, the trial court made.[22] As relevant to this appeal, we know only that the motion was granted, and $1,962.50 in costs associated with the effort to locate Jones were taxed. Notably, Swigart raised this argument in her respondent's brief, and Bruno neither mentioned the issue in his reply brief nor made any effort to augment the record on appeal.

On this record, we are unable to determine whether the ruling at issue exceeds the bounds of reason. Accordingly, by not providing a sufficient record, Bruno "has forfeited [his] argument on appeal" (*Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 259 [exercise of discretion]), and we affirm the postjudgment order (*Ketchum*, *supra*, 24 Cal.4th at p. 1141 [without an adequate record, " '[appellant's] claim must be resolved against [him]' "]; *Hernandez*, *supra*, 78 Cal.App.4th at p. 502).

---

22    From the written order, we know only that the trial court required the parties "to meet and confer regarding *application of the court's ruling* to the various items of costs claimed to determine an accurate sum to be taxed thereunder" and that "the parties have agreed" that $1,962.50 "shall be taxed from the amount claimed on [Bruno's] cost bill" relating to the identified witness. (Italics added.)

23

### 2. *Bruno Did Not Establish an Abuse of Discretion*

Despite the lack of a sufficient record, even if we were to consider the merits of Bruno's argument based on the record provided, the result would be no different.

" 'Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion.' " (*Naser v. Lakeridge Athletic Club* (2014) 227 Cal.App.4th 571, 576.) A trial court abuses its discretion only when " 'in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham*, *supra*, 2 Cal.3d at p. 566.) In this analysis, an appellate court considers the evidence presented and determines whether the trial court's action " ' " 'falls within the permissible range of options set by the legal criteria.' " ' " (*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 452.) As applicable here, the trial court's exercise of discretion in granting a motion to tax costs " 'will not be disturbed if substantial evidence supports its decision.' " (*Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 52.)

In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review and, therefore, will view the pertinent findings "most favorably to the prevailing party" and "in support of the [order on appeal]." (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925.) In so doing, we " '*look*[] *only at the evidence supporting the successful party, and disregard*[] *the contrary showing*.' " (*Ibid.*) The testimony of a single witness or evidence from a single document may be sufficient (Evid. Code, § 411); whereas even uncontradicted evidence in favor of the appellant does not establish the fact for which the evidence was submitted (*Foreman &*

24

*Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890). We must affirm if the finding is supported by substantial evidence, "even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The issue is not whether there is evidence in the record to support a finding the appellant wishes had been made, but whether there is evidence that, if believed, would support the finding actually made. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 872-873.)

In support of the motion to tax the costs that Bruno incurred in attempting to locate Jones, Swigart submitted the following declaration testimony in support of her argument that such costs were unreasonable: "[Bruno] claims $1,982.60 in efforts to locate Grit Jones ($350.00 for skip[]trace and $1,612.60 for surveillance). [Swigart] testified in deposition that Grit Jones did not exist and was a fictitious person. [Citation to deposition testimony that is in the record.] This charge is to find a non-exist[e]nt person who was so known to be."[23] This is sufficient evidence to support the trial court's ruling.

Failing to acknowledge the standard to be applied where an order is being reviewed for substantial evidence on appeal, Bruno cites only to the evidence that *he* contends supports *his* position — at times stressing the credibility of *his* evidence in

---

[23] Swigart's witness's arithmetic is not accurate ($1,612.60 + $350.00 ≠ $1,982.60). In any event, the parties agreed that the amount that could be taxed is $1,962.50.

comparison to Swigart's evidence.[24] By relying on the evidence that supports his position rather than challenging the substantiality of the evidence that supports the trial court's ruling — regardless of the strength of the evidence on which he relies — Bruno does not suggest, let alone show, a lack of substantial evidence to support the court's ruling.

Accordingly, even if we were to consider Bruno's appeal on its merits, Bruno has not meet his burden of establishing that the trial court abused its discretion in taxing the $1,962.50 in costs associated with Bruno's attempt to locate potential witness Jones.

---

[24] In his reply, Bruno also argues that certain of the evidence on which Swigart relies is inadmissible and should not have been considered by the trial court. Having failed to object in the trial court, however, Bruno has forfeited his evidentiary arguments on appeal. (Evid. Code, § 353, subd. (a); *People v. Demetrulias* (2006) 39 Cal.4th 1, 20 [pursuant to Evid. Code, § 353, subd. (a), " ' " [appellant's] failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable" ' "].)

DISPOSITION

The judgment and postjudgment order are each affirmed.  Bruno is entitled to his

appellate costs in Swigart's appeal, and Swigart is entitled to her appellate costs in

Bruno's appeal.


AARON, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.

27

Filed 7/17/17

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KATHLEEN S. SWIGART, | D071072 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. RIC1304282) |
| CARL BRUNO, | ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed June 22, 2017, was not certified for publication. The July 11, 2017 publication request of nonparty Association of Southern California Defense Counsel is GRANTED.

IT IS HEREBY CERTIFIED that the opinion, with the exception of part III.B., meets the standards for publication as specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be partially published in the Official Reports.

_____
HUFFMAN, Acting P. J.

Copies to:    All parties
                Association of Southern California Defense Counsel