Filed 10/20/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B301302 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA205534) |
| v. | |
| TYRONE DOUGLAS, | |
| Defendant and Appellant. | |
| _____ | B306176 |
| In re | |
| TYRONE DOUGLAS | |
| on Habeas Corpus. | |

APPEAL from an order of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge, and petition for writ of habeas corpus. Order affirmed and habeas corpus petition denied.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Acting Supervising Deputy Attorney General, and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

—————————————

Tyrone Douglas challenges the sentence he got for his 2003 murder conviction.  He appeals the trial court's denial of his request for resentencing under Penal Code section 1170.95.  Using the same arguments, Douglas also petitions for a writ of habeas corpus.  We affirm the ruling and deny the habeas petition:  Douglas was a major participant in a felony who acted with reckless indifference to human life.  He does not qualify for resentencing.  Statutory references are to the Penal Code.

I

We recount the facts and procedural posture of this case.

A

The facts are from the record and decision in Douglas's direct appeal, *People v. Douglas* (Sept. 14, 2004, B165097) [nonpub. opn.].  The parties ask us judicially to notice this record.  We do.  The record includes the transcript of Douglas's police interview, which was in evidence at trial.

Douglas was a member of the East Coast Crips.  On a June day in 2000, he carried a gun "for protection."  Douglas had carried it all day.

Douglas conceived the idea of robbing a video store.  He recruited three gang members to help.

Douglas gave his "boy" Tiny Sandman the gun.

It was around noon.  Douglas and Sandman went inside the video store while the others remained outside on watch.

Douglas went in first.  Why?  Because, "Man, we're about to rob the place, that's why."

Douglas looked around inside the store to see who was there.  Then Sandman entered with the gun.

Jose Puente was at the cash register.  Douglas demanded the money, telling Puente to "hurry up" and "give us the money faster."

Puente smiled and reached under the counter.

Douglas twice ordered Puente to put his hands on the counter.

Puente did not obey Douglas's orders.

Sandman shot Puente.  As Douglas put it, "My partner [Sandman] pulled the trigger because we thought he had—he was reaching for a gun."  Later Douglas claimed there was a knife there, but nothing corroborated his claim.

The bullet to Puente's head was eventually fatal:  he died days later.

After Sandman shot Puente, Douglas "looked over the counter, and I saw [Puente] on the floor shaking and stuff.  I saw blood on the ground.  I'm like, man, hurry up, let's get the money."

After the shooting, Douglas "went outside to look around, to see who was out there watching . . . ."  Then he "went back in the store and started getting the money and stuff."  Douglas opened the cash register and "just took it all."  He then emptied Puente's pockets while the clerk lay on the ground with blood pooling around his head.

Douglas and Sandman split the take.  They decided to give nothing to their two lookouts, who left at the sound of gunfire.

Douglas and Sandman left the scene and "bought some weed." Then they smoked it and "started drinking 40's, drinking 40's over there, kicking it. Just kicking it and stuff, man."

What became of Douglas's gun? "We just did some foul stuff with it, man. You know, so we going to get rid of this."

Douglas expressed regret his dollar yield from the robbery was small.

Two days after the video store robbery, Douglas, Sandman, and another gang member committed another robbery. This time it was an auto parts store. Douglas was the lookout. The others went into the store with a gun. Two store employees turned over the money from the register. The robbers tried to take money from the employees' pockets but fled when they heard police had been called. No one was hurt.

Douglas had two jury trials for these crimes, in 2002 and 2003. The first trial resulted in robbery convictions for the auto parts store but a mistrial for the video store events.

In the second trial, the jury convicted Douglas of second degree robbery and first degree murder. The jury found true a special circumstance that the murder occurred during a robbery (§ 190.2, subd. (a)(17)). The jury also found true criminal street gang enhancements and firearm allegations.

Regarding the special circumstance, the trial court instructed the jury that if it found Douglas was not the actual killer, or if it could not decide whether Douglas was the actual killer or an aider or abettor, the jury could find the special circumstance to be true only if it was "satisfied beyond a reasonable doubt that [Douglas] acted with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted

4

in the commission of the crime of robbery which resulted in the death of a human being, namely Jose Puente." The court used former CALJIC No. 8.80.1 (1997 rev.) (6th ed. 1996) for this instruction.

The court sentenced Douglas to life in prison without the possibility of parole for the murder, plus 33 years and eight months to life for his other crimes and enhancements.

In 2004, this court affirmed Douglas's conviction.

B

The current case began in 2019.

An attorney represented Douglas. In 2019, this attorney filed a petition for resentencing under section 1170.95 on Douglas's behalf. The Legislature enacted section 1170.95 with Senate Bill No. 1437 (2017–2018 Reg. Sess.) (SB 1437).

The People filed a response, and Douglas's attorney filed a reply.

The trial court issued an order to show cause. Douglas then submitted additional briefing and hundreds of pages from the record in his direct appeal.

Both sides presented written argument, but neither side opted to offer new evidence, save for a declaration Douglas submitted. This declaration states, in part, that "I became involved in the crimes I am presently incarcerated on by 'hanging out and being stupid.' I was bored on the days the crimes were committed. I accept responsibility for my actions. I made a wrong decision that day. But I was not the one that shot the man at the World Video store."

In his declaration, Douglas expressed no surprise his partner shot the clerk. Nor did Douglas mention anything about

changing his tactics in the auto parts store robbery to reduce the risk of more killings.

The trial court denied Douglas's motion, concluding Douglas still could be convicted of first degree murder under current law. The court explained, "it is clear beyond a reasonable doubt that there was sufficient evidence to convict petitioner . . . of acting with the specific intent to kill as the actual killer of Jose Puente and as a major participant who acted with reckless indifference to human life."

Douglas appealed this trial court ruling to this court. He likewise sought habeas relief from this court.

In both filings, Douglas argues his life sentence is not permissible according to two intervening California Supreme Court decisions involving armed robberies: *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

Since the briefing in this case, our Supreme Court applied *Banks* and *Clark* in a new opinion: *In re Scoggins* (2020) 9 Cal.5th 667, 676–683 (*Scoggins*).

Douglas says *Banks* and *Clark* transformed what it means for an accomplice to be a major participant who acted with reckless indifference to human life for purposes of special circumstance felony murder. He also argues he was not the actual killer.

## II

We review pertinent substantive law, which begins with the 2015 and 2016 *Banks* and *Clark* decisions.

We recounted these decisions in our opinion last year in *In re Parrish* (2019) 42 Cal.App.5th 788, 791–793.

We sketch this familiar landscape in quick strokes.

6

*Banks* held a getaway driver in an armed robbery could not be sentenced to life in prison without the possibility of parole when he was a minor participant who was unaware his actions would involve a grave risk of death.  (*Banks, supra*, 61 Cal.4th at pp. 805–807.)

And *Clark* held it unconstitutional to impose a death sentence on a safety-conscious mastermind just because his minion unexpectedly killed someone during the robbery.  (*Clark, supra*, 63 Cal.4th at pp. 621–623.)

After *Banks* and *Clark*, the Legislature enacted section 1170.95 with SB 1437.  The same bill narrowed the scope of liability for felony murder.  (See *People v. Gomez* (2020) 52 Cal.App.5th 1, 11–12, review granted Oct. 14, 2020, S264033 (*Gomez*).)  Specifically, the Legislature amended section 189, the felony-murder rule, to provide for liability only where the defendant (1) actually killed the victim; (2) aided in the murder with intent to kill; or (3) *"was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."*  (*Ibid.*; § 189, subd. (e), italics added.)  We emphasize the last clause because it is central to this appeal.

Section 190.2 is the felony-murder special circumstances statute.  SB 1437 did not touch this provision.  (See *People v. Galvan* (2020) 52 Cal.App.5th 1134, 1140, review granted Oct. 14, 2020, S264284 (*Galvan*).)  The statute identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole.  Participating in a murder during a robbery is one of these circumstances.  (§ 190.2, subd. (a)(17)(A).)  For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d)

7

permits such punishment only if they acted "with reckless indifference to human life and as a major participant" to a qualifying felony like robbery. Thus, in key respects, the new language in section 189 tracks the language of the special circumstances statute.

Section 1170.95 allows certain people to petition their sentencing court to have their murder convictions vacated and to be resentenced on remaining counts. (§ 1170.95, subd. (a).) The statute establishes a procedure for courts to evaluate the petition and obtain further briefing and information from the parties if the petition has potential merit. (§ 1170.95, subds. (b)(2)–(d)(3).)

Section 1170.95 contains various requirements for resentencing petitions. Among these requirements, petitioners must make a showing they "could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subds. (a)(3) & (b)(1)(A).) The changes to section 188 relate to the natural and probable consequences theory of murder and are not relevant here. (See *Galvan*, *supra*, 52 Cal.App.5th at p. 1140, review granted.)

III

What is the right procedure for people in Douglas's situation? Is section 1170.95 a means of challenging a murder conviction by attacking a prior factual finding? Or is a petition for a writ of habeas corpus the only available procedural vehicle? Authority is split.

A

Some courts say the legislature did not intend section 1170.95 to be used to challenge a murder conviction by attacking a prior factual finding. (*Gomez*, *supra*, 52 Cal.App.5th at pp. 14–

8

17, review granted; *Galvan, supra,* 52 Cal.App.5th at p. 1142, review granted; *People v. Murillo* (2020) 54 Cal.App.5th 160, 168–169; *People v. Allison* (Oct. 2, 2020, B300575) ___ Cal.App.5th ___, ___ [2020 WL 5868095 at *6].)  These courts say someone in Douglas's situation may obtain review only by applying for a writ of habeas corpus petition.  (E.g., *Gomez, supra,* at p. 17.)

The prosecution allies itself with this camp—strenuously, and at some length.  After the prosecution filed its brief expressing these views, Douglas's attorney (perhaps out of lawyerly caution) then filed a habeas petition in our court.  On the merits, this habeas petition is entirely duplicative:  it merely repackages his arguments from his earlier appellate brief.

### B

Other opinions do not insist on the habeas procedure and permit review under section 1170.95.  (*People v. Law* (2020) 48 Cal.App.5th 811, 821–822, review granted July 8, 2020, S262490 [implicit treatment rather than explicit discussion]; *People v. Smith* (2020) 49 Cal.App.5th 85, 94, review granted July 22, 2020, S262835; *People v. Torres* (2020) 46 Cal.App.5th 1168, 1179, review granted June 24, 2020, S262011; *People v. York* (2020) 54 Cal.App.5th 250, 260–263.)

### C

We do not enter this controversy.  It does not matter in this case.  Douglas has used both procedures, and we would reach the same result either way:  Douglas loses.  In different cases, this controversy is potentially of grave portent.  Here, however, the tempest is in a teapot.  Therefore we do not address or decide this question here; we reserve it for a future case where it matters. Today we analyze the issue under both procedures and find both

trails lead to the same destination:  Douglas is not entitled to relief.

IV

The parties both say we review the trial court's findings for substantial evidence.  There possibly is latent complexity here, but, again, in this case it does not matter:  under either procedure, we would reach the same result under any standard of review, whether it be completely independent review, review that is highly deferential, or something else.

Our substantive task is to determine whether Douglas's conduct satisfies the *Banks* and *Clark* tests for accomplice liability.  We must place Douglas on a spectrum of culpability. (*Banks*, *supra*, 61 Cal.4th at pp. 794, 800, 802, 811.)  In a nutshell, does Douglas bear major culpability for the video store murder, or was he blameworthy in an only minor degree?

Examples of minor culpability are the getaway driver who did not know how dangerous the plan was, as in *Banks*, and the robbery mastermind who took special steps to avoid violence and gunplay, as in *Clark*.

The new *Scoggins* holding yields another example of minor culpability.

Willie Scoggins paid Samuel Wilson for three large televisions, but Wilson tricked him.  Scoggins got angry when he opened the television boxes and found only wood and packing paper.  To get retribution as well as his money, Scoggins enlisted others to beat and rob Wilson.  "There is no evidence that the plan involved the use of weapons." (*Scoggins*, *supra*, 9 Cal.5th at p. 671.)  But Scoggins's confederates improvised violently.  When they met with Wilson, one pulled a gun and shot Wilson to death. (*Id*. at pp. 671–672.)

10

The Supreme Court decided Scoggins did not display reckless indifference to human life, which is implicit in knowingly engaging in criminal activities known to carry a grave risk of death. (*Scoggins*, *supra*, 9 Cal.5th at p. 676.) Scoggins did not know a gun would be used. (*Id*. at p. 671.) He was not present during the shooting, so he could not restrain the violence or aid the victim. (*Id*. at p. 678.) Afterwards, Scoggins walked over to the scene and spoke with police, but the import of this visit was ambiguous. (*Id*. at p. 680.) The whole interaction with Wilson was brief. No one restrained Wilson for very long: they just shot him. (*Id*. at pp. 680–681.) Scoggins did not know his confederates were likely to use deadly force. That was not his plan. (*Id*. at pp. 681–682.) Finally, "Scoggins agreed to have the confrontation take place in a public parking lot during the daytime, when the possible presence of witnesses might reasonably be thought to keep his accomplices within the bounds of the plan." (*Id*. at p. 683.)

In short, a mastermind who planned a robbery and beating as revenge bore only minor culpability when his henchmen unpredictably went too far and shot the swindler to death.

Under these cases, Douglas's case is plain: the degree of his culpability is large. Douglas planned and led an armed robbery. When Douglas's partner shot the balky clerk, Douglas reacted as though this development were unfortunate but entirely predictable. Douglas and his gun partner then robbed again a few days later, but did not adjust their robbery method in response to the clerk's shooting. The conclusion is straightforward: Douglas was a major participant who acted with reckless indifference to human life.

11

We give the details of the analysis supporting this conclusion, attending to the considerations our Supreme Court has outlined. (See, e.g., *Scoggins*, *supra*, 9 Cal.5th at p. 677 [directing attention to the totality of the circumstances and listing considerations that may be relevant but that are individually neither necessary nor sufficient].)

The armed robbery was Douglas's brainchild. He recruited Sandman and two others. All were gang members.

Douglas's plan was a gun plan. Douglas's design was to use his loaded gun. He gave it to Sandman but made no effort to unload it or to caution Sandman about restraining his conduct. Everyone knows the main purpose of a loaded gun is to hurt people.

Douglas did not try to stage the robbery at an off-peak time to minimize the chance of violent conflict. (Cf. *Clark*, *supra*, 63 Cal.4th at p. 620 [defendant planned the robbery for after closing time, when most employees would be gone].)

Douglas was present and in charge during the robbery. He led his team into the store and directed the action. His decisionmaking amplified the tension and the risks of spontaneous disaster: he told the victim to hurry up and "give us the money faster."

Douglas's governance of events included no steps to reduce or remedy harm. After Sandman shot Puente, Douglas saw Puente "on the floor shaking and stuff. I saw blood on the ground. I'm like, man, hurry up, let's get the money." Douglas displayed no interest in moderating violence or in aiding his bloody and suffering victim. Rather, Douglas picked his pocket.

Douglas's immediate reaction to the violence did not include remorse. Afterwards, Douglas and Sandman smoked marijuana and drank alcohol: "Just kicking it and stuff, man."

Missing from Douglas's description of the robbery and murder and its aftermath are signs the shooting surprised him. Instead, Douglas ratified the shooting. He said, "My partner pulled the trigger because we thought he had—he was reaching for a gun." Then they got rid of the gun. Douglas explained, "We just did some foul stuff with [the gun], man." Douglas repeatedly used the word "we" to denote the actors. In other words, the shooter behaved as Douglas expected his partner to behave: he shot to kill.

Douglas's response to events at the video store was to rob another place, again with Sandman, and again with a gun, two days later. In this second robbery, Sandman and another entered with a gun while Douglas remained outside as a lookout. Douglas's conduct suggests Sandman's shooting in the video store did not surprise or perturb Douglas: the shooting did not prompt Douglas to ensure nothing like that happened again.

In short, Douglas was the ringleader who deliberately created risks to human life. He took no steps to reduce them. He expressed no surprise or remorse when death was the result. The deadly shooting did not inspire him to change his approach.

Under *Banks*, *Clark*, and *Scoggins*, Douglas's culpability disqualifies him from resentencing.

Douglas cites opinions in which courts have overturned special circumstance findings, but these citations do not help him. The defendants in these cases were peripheral actors. They were getaway drivers or were involved only in planning and were not present for the killings. (See, e.g., *In re Taylor* (2019) 34

13

Cal.App.5th 543, 557–559 [defendant planned after-hours robbery, did not supply the gun, served as getaway driver, stayed in the car, could not see the shooting, and left the scene only when he saw help was coming]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 404–405, 408, fn. 12 [defendant did not plan the robbery, provided the gun at a time when no crime was contemplated, was not present for the murder, and helped with the getaway]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1019–1020, 1023–1026 [defendant was a planner and driver for the robbery but not at the murder scene and did not know if anyone was hurt]; *In re Miller* (2017) 14 Cal.App.5th 960, 964–965, 975 [defendant spotted the robbery target but was absent from the murder scene and was unaware a gun would be used].)

## DISPOSITION

We affirm the trial court's order denying Douglas's resentencing petition and deny his habeas petition.


WILEY, J.


We concur:


BIGELOW, P. J.


GRIMES, J.


14