Filed 6/16/26  PTI US Towers II v. Sinclaire CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

| | |
|---|---|
| PTI US TOWERS II, LLC,<br>　　　　Plaintiff, Cross-defendant and Respondent,<br><br>　　　　v.<br><br>SAMI SINCLAIRE,<br>　　　　Defendant, Cross-complainant and Appellant;<br><br>T-MOBILE WEST, LLC,<br>　　　　Cross-defendant and Respondent. | C101219<br><br>(Super. Ct. No. SCCV-CVCV-2021-01208) |

　　　　PTI US Towers II, LLC (PTI), sued Sammi Sinclaire for breach of contract and specific performance, and Sinclaire filed a cross-complaint against PTI and T-Mobile West, LLC (T-Mobile), for breach of contract and other related causes of action.  The trial court granted in full PTI's and T-Mobile's motions for summary judgment as to all causes of action asserted in PTI's complaint and Sinclaire's cross-complaint and entered judgment in favor of PTI and T-Mobile, and Sinclaire appeals.  As she did throughout most of the proceedings in the trial court, Sinclaire is representing herself on appeal.  Because she fails to overcome the presumption the judgment is correct, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

　　　　Sinclaire owns a large parcel of property in Siskiyou County.  In 2010, she entered into a written "site lease" with T-Mobile pursuant to which she leased it a small portion

1

of her property, consisting of approximately 3,600 square feet and which we will refer to as "the site."  The lease provided T-Mobile would use the site "for the transmission and reception of radio communication signals," and it gave T-Mobile the right to "erect and maintain" "Antenna Facilities," defined as "improvements, personal property and facilities necessary to operate its communications system, including, without limitation, radio transmitting and receiving antennas, microwave dishes, tower and base, equipment shelters and/or cabinets and related cables and utility lines and a location based system." In laymen's terms, T-Mobile would erect and operate a cell tower on the site.

Section 1(b) of the lease provided, "Landlord agrees to cooperate with Tenant in obtaining … all licenses and permits or authorizations required for Tenant's use of the [site] … from all applicable government and/or regulatory entities … and Landlord agrees to cooperate with and to allow Tenant … to obtain … land-use permits," and "will not interfere with Tenant's efforts to secure other licenses or permits."  And section 18(d) provided, "Each party agrees to cooperate with the other in executing any documents … necessary to protect its right or use of the [site]."

Section 7(a) provided, "Prior to the commencement of its construction, Tenant shall submit to Landlord plans and specifications (the 'Plans') for the installation showing the size, height and appearance of the component parts of the installation. Landlord shall have the right to approve the Plans in writing, provided that such approval shall not be unreasonably withheld, delayed, or conditioned.  Landlord's approval must be given or denied within seven (7) days after submission thereof by Tenant.  Failure of Landlord to approve or object to the Plans within said seven (7) day period shall be deemed an approval. …  Tenant shall have the right to alter, replace, expand, enhance and upgrade the Antenna Facilities for its own use at any time during the term of this Lease."

The initial term of the lease was five years, and T-Mobile had the right to extend it for five additional five-year terms. The rent was $1,250 per month, with an automatic annual increase of 3 percent.

The lease required Sinclaire to "pay … all real property taxes for the Property, including the [site]," but also provided, "Tenant shall pay any personal property tax, real property tax or any other tax or fee which are directly attributable to the presence or installation of the Tenant's Antenna Facilities. … If Landlord receives notice of any personal property or real property tax assessment … which … is directly attributable to Tenant's installation, Landlord shall provide timely notice of the assessment to Tenant sufficient to allow Tenant to consent to or challenge such assessment." In other words, T-Mobile was responsible for paying taxes attributable to the Antenna Facilities, but Sinclaire first had to notify it of any such tax assessment.

Finally, section 15 of the lease, which addressed assignment and subleasing, provided: "Tenant may assign this Lease … upon written notice to Landlord, provided however the assignee provides Landlord with a written acknowledgement and acceptance of Tenant's obligations and liabilities under this Lease. Upon such assignment, Tenant shall be relieved of all liabilities and obligations hereunder and Landlord shall look solely to the assignee for performance under this Lease and all obligations hereunder. Tenant may sublease all or a portion of the [site], upon prior written notice to and approval by Landlord … . Tenant shall pay to Landlord fifty percent (50%) of the net rent revenue actually received by Tenant ('Additional Rent'). Such Additional Rent shall be payable with Tenant's monthly payment of Rent."

It appears T-Mobile completed construction of a cell tower and related facilities in or around 2010 and paid rent to Sinclaire as required by the lease without incident for around five years.

In mid-2015, T-Mobile's parent company entered into a complicated transaction with an affiliate of PTI pursuant to which PTI purchased a portion of T-Mobile's "tower

3

portfolio." According to the "purchase and sale agreement," some of the sites in T-Mobile's tower portfolio were designated by the parties as "Non-Assignable," including the site at issue in this case. The purchase and sale agreement provided that, as to these nonassignable sites, T-Mobile and PTI would "enter into a management agreement … pursuant to which [T-Mobile] shall grant to [PTI] … the right to operate each Managed Site … until such time as such Managed Site becomes an Assignable Site."

In August 2015, T-Mobile sent Sinclaire a letter notifying her it had entered into a "transaction" with PTI regarding PTI's "ownership, management and operation of a portion of the T-Mobile tower portfolio, of which your site(s) is/are a part." The letter stated that, pursuant to the terms of the transaction, T-Mobile would transfer the relevant site leases to several newly formed T-Mobile subsidiaries, and the T-Mobile subsidiaries would be acquired by PTI. It also stated, "T-Mobile will continue to maintain its communication facilities on the site(s) and will lease such facilities from such newly formed subsidiaries except in certain circumstances." Sinclaire contends this letter demonstrates T-Mobile would assign the site lease to PTI and then sublease space on the tower from it.

In November 2015, PTI and T-Mobile entered into a "management agreement" pursuant to which T-Mobile appointed PTI to manage, administer, and operate each "Managed Site," including the site at issue in this case. The management agreement provided PTI shall act "as the exclusive operator of each Managed Site," and that "no fee title, leasehold, subleasehold or other real property interest … is granted" to it. It also provided PTI "shall be entitled to and vested with the rights, powers and privileges of [T-Mobile] with respect to the management, administration and operation of the Managed Sites … as if [PTI] were the true owner thereof, including the right to review, negotiate and execute … extensions, renewals, … subleases, … or other similar or related agreements." Finally, it provided T-Mobile shall not "exercise any rights or take any

4

actions with respect to the operation, maintenance, leasing or licensing of any Managed Site, all such rights being exclusively reserved to [PTI]."

In November 2015, PTI and T-Mobile sent letters to Sinclaire informing her of the management agreement and that PTI now "manages, administers, and operates the communication facility on the Property," and PTI asked Sinclaire to complete a form that would allow it to pay her rent via electronic deposit directly to her bank account. Sinclaire appears to contend that, under the lease, only the tenant could pay her rent, ergo PTI must be the tenant, ergo T-Mobile must have assigned the lease to it.

In or around August 2017, PTI sent a letter to Sinclaire informing her it had subleased space on the tower to AT&T, and that, as required by section 15 of the lease, it would be paying her 50 percent of the net revenue received from AT&T as "Additional Rent," which it estimated would be $1,617 per month. Because Sinclaire highlights this fact, we note this letter opens with the following statement: "As you know, PTI … *is the tenant* under a Ground Lease for the tower located" on the site. Sinclaire signed the letter to indicate she "accepted" the AT&T sublease.

In support of their motions for summary judgment, PTI and T-Mobile submitted a declaration from PTI's general counsel stating (1) T-Mobile never assigned the lease to PTI, (2) PTI and T-Mobile never entered into a sublease agreement, and (3) PTI does not receive any rent payments from T-Mobile related to the site, and it merely delivers T-Mobile's rent payments to Sinclaire in its capacity as manager of the site. He also stated, "Aside from the AT&T Sublease, no other Subleases exist as to the relevant Site." Finally, he stated PTI has paid Sinclaire all rent due and owing from T-Mobile pursuant to the site lease, and all additional rent due and owing pursuant to the AT&T sublease, and he attached to his declaration a spreadsheet showing all payments PTI had made to Sinclaire. At the time the spreadsheet was prepared, PTI was paying Sinclaire approximately $3,656 a month, or $43,872 a year.

5

In late 2020, PTI and T-Mobile sought a permit to complete certain equipment modifications on the site. According to a description of the work contained in two permit applications that were submitted in support of the motions, they wanted to make modifications to the existing tower and/or to install a backup generator. Sinclaire's consent was required in order for T-Mobile to obtain a permit, and PTI thus asked her to sign a letter of authorization (LOA) authorizing T-Mobile to act as her agent for the purpose of applying for and obtaining the necessary permits. When PTI received no response to its request, it sent her letters in September and October of 2021 reiterating its request that she sign a LOA authorizing the filing of a building permit application necessary to complete equipment modifications at the site. PTI did not receive a response from Sinclaire.

In November 2021, PTI filed the present complaint against Sinclaire for breach of contract and specific performance. It alleged Sinclaire's refusal to execute the LOA constituted a breach of her duty to "cooperate with Tenant in obtaining … all licenses and permits … required for [its] use of the Premises," as required by section 1(b) of the lease, and a breach of her duty "to cooperate … in executing any documents … necessary to protect its rights or use of the Premises," as required by section 18(d) of the lease. It alleged it had no adequate remedy at law for Sinclaire's breaches, and it sought a decree of specific performance requiring her to execute the LOA.

Sinclaire filed an answer generally denying the allegations in the complaint and asserting 25 affirmative defenses. She also filed a cross-complaint against PTI and T-Mobile. The primary basis for her cross-complaint is her allegation that T-Mobile *assigned* the lease to PTI (thus making PTI the tenant) and then *subleased* space on the tower from PTI, and that PTI has never paid her 50 percent of the rent it received from T-

6

Mobile as additional rent, in breach of section 15 of the lease.[1]  She alleged PTI referred to itself as the "tenant" for several years before "revers[ing] its position" and misrepresenting itself as the "manager" of the site with T-Mobile remaining the tenant. She alleged PTI and T-Mobile made these misrepresentations (i.e., that PTI was merely the manager and T-Mobile remained the tenant) "in order to avoid the obligation under Section 15 of the Lease to pay Additional Rent to Sinclaire cut T-Mobile's sublease." She also alleged PTI and/or T-Mobile breached the lease by:  (1) subleasing space on the tower to unidentified and unknown third parties without notice and without paying her additional rent; (2) obtaining "unauthorized permits" to "add[] antennas and/or other equipment" to the site "without proper notice to or approval from Sinclaire"; (3) failing to pay taxes and fees attributable to the Antenna Facilities; (4) installing an "unauthorized gate" that cuts off her access to portions of the property; and (5) allowing unidentified third parties to cut down timber on her property.  Based on these allegations, she asserted causes of action against PTI and T-Mobile for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) declaratory relief, (4) fraudulent misrepresentation, (5) financial elder abuse, and (6) an accounting, and (7) a cause of action against T-Mobile only for contractual indemnification.

PTI filed a motion for summary judgment or summary adjudication on its complaint, and PTI and T-Mobile filed substantially similar motions for summary judgment or summary adjudication on the cross-complaint.  They supported their motions with the evidence described above, and with Sinclaire's written discovery responses.  In addition to the statements described above, PTI's general counsel also stated that Sinclaire never provided PTI with notice of any tax assessment attributable to the Antenna Facilities, and, "To the extent any trees were ever cut down on the Site, the

---

[1]     In other words, Sinclaire contends PTI owed her rent as the tenant, and also owed her 50 percent of whatever it received from T-Mobile as additional rent.

person or entity that engaged in such conduct was not hired or retained by PTI or T-Mobile, or has any relationship whatsoever with PTI or T-Mobile."

Sinclaire filed a lengthy and often confusing opposition to the motions that included over 260 pages of exhibits labeled A through V, with little to no explanation as to their relevance. She also filed two declarations; the first was unsigned and did not mention or authenticate most of her exhibits and the second did not mention any of the exhibits, much less authenticate them.

PTI filed 53 objections to Sinclaire's exhibits,[2] and the trial court sustained 36 of them. Among the exhibits proffered by Sinclaire that survived the objections are the following two documents. First, an August 2015 letter from PTI to Sinclaire announcing the transaction with T-Mobile that stated the following: "As part of the Transaction, the T-Mobile entity that holds the Agreement(s) will transfer all of its rights, title and interest in and to the Agreement(s) and the Site(s) to a new entity, which will be formed by T-Mobile.[3] As part of the Transaction, this new entity will be purchased by and become a subsidiary of Buyer [i.e., PTI] or an affiliate thereof (the 'New Subsidiary'), and the New Subsidiary will sublease, grant an option to sublease, or grant certain rights to T-Mobile in the Agreement(s) and the Site(s) regarding T-Mobile's antenna facilities. The transfer to an affiliate may require multiple internal assignments among affiliates." Sinclaire contends this letter — which is quite confusing — demonstrates T-Mobile "assigned/sold the [site] lease to PTI," and then subleased space on the tower from PTI.

Second, a February 2016 letter from PTI to Sinclaire asking for "your consent to the assignment of the ground lease … from T-Mobile to PTI." The letter also noted in

---

[2]     T-Mobile "adopt[ed]" PTI's evidentiary objections.

[3]     According to the letter, the "Agreements" and the "Sites" are described in an attachment labeled exhibit A, but exhibit A is not part of the record on appeal. We presume the agreements include the site lease at issue in this case.

8

passing that, as part of the transaction between PTI and T-Mobile, "PTI purchased the sites that were assignable, and manages and operates the site where consent is needed." Sinclaire's position is that her consent was *not* needed to assign the site lease, ergo PTI does not manage her site and must have purchased (i.e., been assigned) the site lease.

At the hearing on the motions, the court stated it intended to rule from the bench, and it began with the motions for summary judgment or adjudication as to Sinclaire's cross-complaint against PTI and T-Mobile. On the issue of whether T-Mobile assigned the site lease to PTI, the court found it did not. Instead, it found the evidence produced by PTI and T-Mobile demonstrated T-Mobile remained the tenant under the site lease, it did not assign the site lease to PTI and PTI did not receive an assignment, PTI merely managed the site and the site lease as provided in the management agreement, and Sinclaire produced no evidence to the contrary. The trial noted some of PTI's communications were "sloppy" and that, perhaps as a result, Sinclaire believed PTI was the tenant and T-Mobile was subleasing from PTI. The trial court found, however, that Sinclaire was simply "mistaken" in her belief.

The trial court acknowledged Sinclaire's argument that her consent was not required to assign the lease, but it found that when she failed to "consent to the assignment of the lease as requested" by PTI and T-Mobile, that "put PTI and T-Mobile in the position where they did not assign the lease, and, therefore, there was no assignment," and "they entered into the manage[ment] agreement" instead. In other words, even if Sinclaire's consent was not required in order to assign the lease, when her consent was not forthcoming, PTI and T-Mobile elected to treat the lease as nonassignable and to enter into the management agreement.[4]

---

[4] We note Sinclaire cites no legal authority that would prohibit T-Mobile and PTI from treating the lease as nonassignable absent her express consent. Relatedly, she also cites no legal authority for the proposition that PTI's letters to her could override the

9

The trial court also found Sinclaire did not produce any evidence that she was owed additional rent; that she notified PTI or T-Mobile she was assessed taxes attributable to the Antenna Facilities; or that PTI or T-Mobile used the site in a manner that was not allowed by the lease or interfered with her access to the remainder of her property. Finally, it found Sinclaire produced no evidence she detrimentally relied on any alleged misrepresentation made by PTI or T-Mobile (which was an essential element of her fraudulent misrepresentation claim), and no evidence PTI or T-Mobile exerted any undue influence over her (which was an essential element of her financial elder abuse claim).

Based on these findings, the trial court granted PTI's and T-Mobile's motions for summary adjudication as to each cause of action asserted in Sinclaire's cross-complaint.

As to PTI's complaint against Sinclaire for breach of contract and specific performance, the court found it was undisputed the parties entered into the lease, Sinclaire produced no evidence PTI or T-Mobile breached the lease, and the undisputed evidence showed Sinclaire breached the lease by failing to sign the documents necessary to allow PTI or T-Mobile to obtain permits to allow for maintenance or upgrades to the site and the tower. The court thus found "the request for specific performance should be granted."

At the conclusion of the hearing, the trial court directed counsel for PTI and T-Mobile to draft a proposed statement of decision consistent with its ruling, which they did. Sinclaire filed objections to the proposed statement of decision, but the trial court ultimately adopted the proposed statement of decision as its own. Judgment was entered in favor of PTI and T-Mobile, and Sinclaire filed a timely notice of appeal.

---

express terms of the management agreement — which provides PTI shall "manage, administer and operate" the site, T-Mobile "shall retain its right, title and interest in" the site, and "no fee title, leasehold, subleasehold or other real property interest in [the site] is granted" — and convert PTI into an assignee with a real property interest in the site.

**DISCUSSION**

***1.    Appellate Procedure***

We note a few things about appellate procedure at the outset because they effectively dispose of most of this appeal.

First, although Sinclaire "is representing [her]self in propria persona, [s]he is not exempt from the rules governing appeals. A self-represented party is to be treated like any other party and is entitled to the same, but no greater, consideration than other litigants having attorneys." (*Elena S. v. Kroutik* (2016) 247 Cal.App.4th 570, 574.) "Thus, as is the case with attorneys, pro. per. litigants must follow correct rules of procedure." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247.)

Second, it is a "fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

Third, in order to overcome the presumption of correctness, "It is the responsibility of the appellant, here [Sinclaire], to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 (*Allen*).) Relatedly, "An appellate court is not required to … make arguments for parties" (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106), or "to construct theories or arguments to undermine the judgment and defeat the presumption of correctness" (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852). Thus, absent meaningful argument and citation to supporting legal authorities from Sinclaire, we must fall back on the presumption that the judgment is correct. As

11

will be discussed in more detail below, most of Sinclaire's contentions lack meaningful argument or citation to relevant legal authorities.

Fourth, an appellate brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."[5] (Cal. Rules of Court, rule 8.204(a)(1)(C).) "When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited." (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407.) These rules have adverse consequences for Sinclaire because her opening brief[6] contains numerous factual assertions that are not supported by any citation to the record. For example, on page No. 11 she states, "PTI trespassed [on] Sinclaire's property with the new fence, gate, locks, and a sign designating them as the owner of the land," and on page No. 22 she states, "PTI, by way of the new gate and fence were allowing … access to the property to others who took her timber." Neither assertion is supported by citation to the record, and we thus disregard them and all others that are similarly unsupported.

We also disregard factual assertions that are supported by citations to the record that do not actually support the asserted fact. For example, on page No. 26 of her brief, Sinclaire states the permit application at issue in this case required the property owner to sign the following statement: "Before a building permit is issued, this form must be completed and signed by the property owner and returned to the agency responsible for issuing the permit." She supports this statement by citing pages Nos. 355 to 357 of her

---

[5] Sinclaire's appendix contains 10 volumes, but she never cites the volume number and only cites the page number, which makes locating the pages she cites much more difficult than it needed to be.

[6] Sinclaire did not file a reply.

appendix. The cited pages appear to consist of a 2017 permit application, but we cannot find the quoted language anywhere on the cited pages, and they thus provide no evidentiary support for the asserted fact.[7]

Finally, we disregard factual assertions that are supported by citations to the record that are too broad to be useful. For example, page No. 16 of Sinclaire's brief contains a paragraph identified by the letter "C" that makes factual assertions about a report from the Federal Communications Commission (FCC) verifying there were eight different carriers on her property, and she supports this paragraph with the following citation to the record: "Pa 366-471." The citation encompasses over 100 pages and includes all of Sinclaire's exhibits I through U, most of which have nothing to do with either the FCC or different carriers on her property (and we note the trial court sustained many objections to these exhibits). In order to comply with her obligation to cite the volume and page number of the record that supports her factual assertions, Sinclaire must provide " '*exact page citations*' " rather than "block pages references," because, as a practical matter, we are unable to identify what evidence Sinclaire believes supports her factual assertion when she cites over 100 pages and 13 exhibits, particularly where, as here, a large portion of the cited pages appear to be irrelevant. (*Nazari v. Ayrapetyan* (2009) 171 Cal.App.4th 690, 694, fn. 1.) We thus disregard the factual assertions in this paragraph, and all others that are similarly supported by citations to the record that are too broad to be of any practical use.

Fifth, and finally, an appellant is required to "[s]tate each point under a separate heading or subheading summarizing the point." (Cal. Rules of Court, rule

---

[7] And as a legal matter, we note there is case law that teaches where a lessee leases real property for a particular purpose, the lessee "qualifies as an owner with standing to apply for a zoning variance," a use permit, or a building permit related to that purpose. (*Shell Oil Co. v. City & County of San Francisco* (1983) 139 Cal.App.3d 917, 920.)

13

8.204(a)(1)(B).)  This rule " 'was designed to lighten the labors of the appellate tribunals by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass.' " (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 180.) "Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Id*. at p. 179.)  Moreover, we need only address "the arguments raised by appropriate headings in the argument portion of [Sinclaire's] briefs." (*Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 780, fn. 1.)  The headings in the argument portion of Sinclaire's brief are as follows: (1) "Introduction"; (2) "False Statements in the Order of the Court"; (3) "Legal Arguments:  Prejudice and Error"; (4) "Sinclaire's Objections to Rulings on the Evidence"; (5) "Causes of Action in the Cross Complaint Addressed in the Order of the Court:  Rules of Law Violated by the Proposed and Final Statements"; and (6) "Other Legal Arguments RE:  Responses, Points and Authorities."  These headings do not tell us what Sinclaire is arguing on appeal or on what basis she challenges the judgment. Nonetheless, we have attempted to address those arguments we can discern in the argument portion of her brief, but we have not attempted to address arguments that may be lurking in other portions of the brief.

## 2.      *Summary Judgment Law and Standard of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)  Summary judgment thus " 'look[s] behind the pleadings to determine if the claims or defenses of a party are sham or without any evidence to support the claim.' " (*Little v. Community Bank* (1991) 234 Cal.App.3d 355, 358.)  "[T]he party moving for summary judgment bears the burden of persuasion

that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. … [Citation.] There is a triable issue of material fact if, and only if, the evidence [submitted in support of and opposition to the motion] would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion." (*Id.* at p. 850, fn. omitted.)

Either a plaintiff (or cross-complainant) or a defendant (or cross-defendant) may move for summary judgment. (Code Civ. Proc., § 437c, subd. (p) (hereafter § 437c); *Aguilar, supra*, 25 Cal.4th at p. 843.) A plaintiff moving for summary judgment must prove "each element of the cause of action entitling the party to judgment on the cause of action." (§ 437c, subd. (p)(1).) "Plaintiff's initial burden … d[oes] not include disproving any affirmative defenses asserted by defendants." (*Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 564, italics omitted.) "Once the plaintiff … has met that [initial] burden, the burden shifts to the defendant … to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (§ 437c, subd. (p)(1).) A defendant or cross-defendant moving for summary judgment must show "that one or more elements of the cause of action … cannot be established … . Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (§ 437c, subd. (p)(2).)

"Although the parties seeking summary judgment bear the initial burden to support their motions with admissible evidence showing there is no triable issue of material fact, once that showing has been made the opposing party can only avoid summary adjudication by submitting competent rebuttal evidence from which the court can infer these material facts are genuinely disputed." (*Miller v. Nestande* (1987) 192 Cal.App.3d 191, 197.) The party opposing the motion "shall not rely upon the

allegations or denials of its pleadings to show that a triable issue of material fact exists." (§ 437c, subd. (p)(1), (2).)

"We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) In performing this de novo review, we consider all the evidence submitted with the moving and opposing papers, except evidence to which objections were made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) We view the evidence in the light most favorable to the nonmoving party, here, Sinclaire, and resolve evidentiary doubts or ambiguities in her favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

Although our review is de novo, we do not ignore the trial court's decision. Instead, and as noted above, that decision is presumed correct, and it is Sinclaire's burden to affirmatively establish reversible error. (See *Jameson v. Desta, supra*, 5 Cal.5th at pp. 608-609; *Swigart v. Bruno* (2017) 13 Cal.App.5th 529, 535.) We may affirm a ruling granting a motion for summary judgment "if it is correct on any ground, regardless of the trial court's stated reasons." (*Truck Ins. Exchange v. County of Los Angeles* (2002) 95 Cal.App.4th 13, 20.)

## 3. *Sinclaire Fails to Demonstrate Reversible Error as to the Causes of Action She Does Not Address*

On the merits, we first explain why Sinclaire's failure to address the majority of the trial court's ruling necessarily means she fails to demonstrate reversible error.

In her brief, Sinclaire barely mentions the following six causes of action asserted in her cross-complaint, other than to state she asserted them: (1) breach of the covenant of good faith and fair dealing; (2) declaratory relief; (3) fraudulent misrepresentation; (4) financial elder abuse; (5) contractual indemnification; and (6) request for an accounting. As noted, the trial court's order is " 'presumed correct' " and Sinclaire has

16

the "burden of establishing reversible error." (*Swigart v. Bruno, supra*, 13 Cal.App.5th at p. 535, italics omitted.) "To demonstrate error, [Sinclaire] must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error.' " (*In re S.C., supra*, 138 Cal.App.4th at p. 408.) And again: "[A]n appellant must do more than assert error and leave it to the appellate court to search the record and the law books to test [her] claim. The appellant must present an adequate argument including citations to supporting authorities and to relevant portions of the record." (*Yield Dynamics, Inc. v. TEA Systems Corp*. (2007) 154 Cal.App.4th 547, 557.) Merely noting she asserted a cause of action in no way meets her burden of demonstrating the trial court erred when it summarily adjudicated that cause of action in favor of PTI and T-Mobile.

Sinclaire's only other mention of the breach of covenant claim is to quote a provision from the Uniform Commercial Code that provides, "Every contract or duty within this code imposed an obligation of good faith in its performance and enforcement" (Cal. U. Com. Code, § 1304), and to then to state, with no further discussion, PTI and T-Mobile "breached this requirement." "[C]iting cases [or statutes] without any discussion of their application to the present case results in forfeiture." (*Allen, supra*, 234 Cal.App.4th at p. 52.) Similarly, "The mere assertion of a statutory … violation, followed by simply a citation to the statute … , does not merit a judicial response." (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 677.)

Sinclaire's only other mention of the financial elder abuse claim is to state that PTI and T-Mobile have caused her so much stress she continues to come down with COVID-19 and they took away "a source of income that prevented her from hiring attorneys to take this case to trial." This statement is accompanied by no citation to the record and no citation to any legal authority. As noted, "[w]e may disregard factual contentions that are not supported by citations to the record" (*Tanguilig v. Valdez* (2019) 36 Cal.App.5th 514, 520), and, "issues not addressed as error in a party's opening brief with legal analysis and

17

citation to authority are forfeited" (*Golden Door Properties, LLC v. Superior Court* (2020) 53 Cal.App.5th 733, 786).

### 4.    *The Evidence and the Contentions We Do Not Consider*

We next explain why we do not consider much of the evidence Sinclaire submitted in opposition to the motions for summary judgment and many of her contentions.

As noted, PTI filed 53 separately numbered objections to Sinclaire's evidence, and the trial court sustained 36 of them.  Each of PTI's objections was based on multiple grounds, and the trial court explained, "unless I otherwise state, if I sustain an evidentiary objection, it's based on the authority cited."

In her brief, Sinclaire notes the trial court "follow[ed]" most of the objections to her evidence, and "disallowed" many of her exhibits.  She also correctly identifies the 36 objections the trial court sustained, and she then states, with no additional explanation and no citation to legal authority, "This is Reversible Error."  She does not identify or discuss any particular objection, and we thus find she has forfeited any challenge to the trial court's evidentiary rulings.

"The weight of authority holds that the standard for reviewing the trial court's evidentiary rulings is abuse of discretion [citation], but there is some dispute as to whether evidentiary rulings made in the summary judgment context should instead be reviewed de novo [citation]." (*Morales-Simental v. Genentech, Inc.* (2017) 16 Cal.App.5th 445, 451.)  Whatever the standard of review, however, it is Sinclaire's burden to "identify the specific objection, provide legal argument explaining why the trial court's ruling was in error, and support that argument with citation to pertinent legal authority." (*City of Crescent City v. Reddy* (2017) 9 Cal.App.5th 458, 463.)  Sinclaire fails to meet her burden.  She "make[s] no attempt to demonstrate how each evidentiary ruling was erroneous.  [She] ha[s] not specified the evidentiary objections to which [her] cursory argument is addressed, nor ha[s] [she] discussed the multiple grounds on which each objection was sustained. …  In arguing only generalities, [Sinclaire's] brief[] do[es]

18

not contain 'argument and citations to authority as to why the trial court's evidentiary rulings were wrong.' [Citation.] 'We are not required to search the record to ascertain whether it contains support for [Sinclaire's] contentions.' " (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074.) "By failing to present legal argument with respect to individual objections, [Sinclaire] forfeited any challenge to the trial court's evidentiary rulings." (*Reddy*, at p. 464.) Sinclaire's forfeiture affects our review in this case because on appeal after a motion for summary judgment has been granted we do not consider evidence "to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We thus do not consider any of the evidence proffered by Sinclaire to which objections were made and sustained.

Sinclaire may argue she had insufficient time to respond to the objections because she states T-Mobile "did not file their Objections … until five days before the Hearing so she could not amend it, which is prejudicial" and "is reversible error." PTI and T-Mobile both filed their objections to Sinclaire's exhibits with their reply papers, and their reply papers were filed "not less than five days preceding the noticed or continued date of hearing," as required by section 437c, former subdivision (b)(4).[8] The objections were thus timely filed.

Sinclaire's brief refers to a "Timeline," and we presume this refers to a document filed with her opposition papers that was captioned, "TIMELINE AND EXHIBITS SENT TO PTI AND T-MOBILE IN RESPONSE TO DISCOVERY REQUESTS." The timeline, to put it generously, is difficult to understand, primarily because it references

---

[8]     The hearing in this case was held in 2023 and the statement of decision and judgment were entered in 2024, and at that time, reply papers had to be filed not less than five days prior to the hearing. Effective January 1, 2025, section 437c, subdivision (b)(4) was amended to provide reply papers must be filed "not less than 11 days preceding the noticed or continued date of hearing."

exhibits that do not appear to be part of the record on appeal. For example, the timeline references exhibits W through LLL, but there are no exhibits in the record that are so labeled (Sinclaire's exhibits in opposition to the summary judgment motions are labeled A through V). The exhibits described in the timeline also do not appear to correspond to the exhibits that are part of the record. For example, the timeline describes exhibit "B" as "TMO [presumably T-Mobile]/LL [presumably Landlord] Use Permit approval from Siskiyou County" dated October 4, 2011. The exhibit B that Sinclaire submitted with her opposition papers, however, consists of a 2015 letter from T-Mobile and a 2015 press release from PTI (and the trial court sustained PTI's objections to the press release). It is possible the exhibits described in the timeline were submitted in opposition to the motion but were identified by different letters. If so, Sinclaire needed to clearly explain this, because without such an explanation, the timeline is not competent evidence of anything, and we thus do not consider it.

We also do not consider evidence that was not before the trial court when it ruled on the motions. "The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later." (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19.) We thus do not consider the three-page declaration from Sinclaire that follows her brief because it was not before the trial court when it considered the motions.

Finally, Sinclaire has forfeited many of the contentions that appear in the argument section of her brief. Here — in full — is one such contention: "As the Transcript will show, Sinclaire was sick at the time of the hearing on December 21, 2023. She was asked to speak up several times. She did not know that she was sick from carbon monoxide exposure until two days later when her furnace shut down. The repairman measured the levels of carbon monoxide and found them to be dangerous. Sinclaire had been sick since September when she turned on her furnace. As it got colder she got more sick which she thought was the flu or Covid until the repairman advised her

of the carbon monoxide leakage in December.  Sinclaire argues that this was prejudicial to her as she struggled to reply to the objections, etc. and could not adequately represent herself at the Hearing."  There are no citations to the record to support the factual contentions in this paragraph, and we thus disregard them.  (See *Tanguilig v. Valdez, supra*, 36 Cal.App.5th at p. 520.)  Moreover, there is no meaningful argument or citation to legal authority to support the suggestion that illness somehow demonstrates reversible error.  "We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions [s]he wants us to adopt.' "  (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.)  Whatever point Sinclaire was trying to make in the above-quoted paragraph, we treat it "as forfeited and pass it without consideration." (*Allen, supra*, 234 Cal.App.4th at p. 52.)

The same goes for other contentions that are similarly devoid of meaningful legal argument.  "Although we exercise our discretion to consider those issues we can discern in [Sinclaire's] unsystematic and often incoherent arguments, there are times when it is simply not possible for us to understand what [she] is arguing.  Any arguments not discussed in this opinion are deemed forfeited."  (*United Grand Corp. v. Malibu Hillbillies, LLC, supra*, 36 Cal.App.5th at p. 153.)

5.  ***Analysis of Sinclaire's Discernable Arguments***

We now turn to the arguments we are able to discern in Sinclaire's brief.

**A.     It was not improper to ask counsel to draft the statement of decision**

Sinclaire notes PTI and T-Mobile drafted the statement of decision, and she suggests this was improper (or, in her words, "prejudicial and fraudulent").  It was not improper.  "[J]udges customarily request the prevailing party to draft a proposed statement of decision."  (*Thompson v. Friendly Hills Regional Medical Center* (1999) 71 Cal.App.4th 544, 550, fn. 5.)  Rule 3.1590 of the California Rules of Court provides the court, after orally announcing its tentative decision, may "[o]rder a party to prepare a

21

statement of decision." (Cal. Rules of Court, rule 3.1590(c)(3); see Cal. Rules of Court, rule 3.1590(a), (c), (f).) It further provides, "A party that has been ordered to prepare the statement must within 30 days after the announcement … of the tentative decision, serve and submit to the court a proposed statement of decision and proposed judgment." (Cal. Rules of Court, rule 3.1590(f).) The opposing party may then "file objections to the proposed statement of decision or judgment." (Cal. Rules of Court, rule 3.1590(g).) Similarly, rule 3.1312 of the California Rules of Court requires the prevailing party on a noticed motion (which would include the summary judgment motions at issue here) to prepare "a proposed order for approval [by the court] as conforming to the court's order," and provides "the other party or parties must notify the prevailing party as to whether or not the proposed order is so approved," and, if not, "must state any reasons for disapproval." (Cal. Rules of Court, rule 3.1312(a).)

That is precisely what happened in this case. At the hearing on the motions, the trial court announced that it intended to "rul[e] from the bench," and then proceeded to do so. After explaining the basis for its ruling in some detail and discussing each cause of action to which the motions were directed, it directed counsel for PTI and T-Mobile to draft a statement of decision "consistent with the court's ruling." PTI and T-Mobile then prepared and served a proposed statement of decision and judgment, Sinclaire filed objections thereto, and the trial court ultimately crossed out the word "proposed" and signed and filed the statement of decision. There was nothing improper about this process.

### B. Alleged "false" evidence

Sinclaire accuses the trial court of accepting false evidence and allowing PTI and T-Mobile to "place false documents and statements before the court," but she does not clearly identify where we can find this allegedly false evidence in the record. Again, "When an appellant's brief makes no reference to the pages of the record where a point can be found," we can and do "deem the contention to lack foundation and, thus, to be

22

forfeited." (*In re S.C., supra*, 138 Cal.App.4th at pp. 406, 407.) Seemingly related to the issue of false evidence, Sinclaire also cites various rules of professional responsibility for attorneys, including rules prohibiting attorneys from making false statements or from engaging in dishonest or deceitful conduct, but she does not explain how these rules are relevant to our review of the judgment. To the extent she contends PTI and/or T-Mobile or their attorneys submitted false evidence in support of their motions, we note she did not object to any of the evidence submitted and has thus waived any complaints about the trial court's consideration of that evidence. (See § 437c, subd. (b)(5) ["Evidentiary objections not made at the hearing shall be deemed waived"].)

By referring to "false" evidence, Sinclaire may be trying to argue she disproved the evidence submitted by PTI and T-Mobile in support of the motions, which, in turn, would demonstrate that triable issues of fact exist, which would preclude summary judgment. If so, the argument fails because, as the trial court found, her opposing separate statement was insufficient to demonstrate the existence of triable issues of fact.

As required by section 437c, subdivision (b)(1), PTI's and T-Mobile's moving papers included "a separate statement setting forth plainly and concisely all material facts [they] contend[] are undisputed." And as required by rule 3.1350 of the California Rules of Court, their separate statement identified "in numerical sequence" each "material fact claimed to be without dispute" with respect to each cause of action that is the subject of the motion, "followed by the evidence that establishes those undisputed facts." (Cal. Rules of Court, rule 1350(d)(1), (3).) Sinclaire was required to submit an opposing separate statement that "unequivocally state[s]" as to each proffered fact whether it is " 'disputed' " or " 'undisputed.' " (Cal. Rules of Court, rule 3.1350(f).) For each fact she stated was disputed, she was required to "state … the nature of the dispute and describe the evidence that supports the position that the fact is controverted. Citation to the evidence in support of the position that a fact is controverted must include reference to the exhibit, title, page, and line numbers." (Cal. Rules of Court, rule 3.1350(f)(2).)

The trial court found Sinclaire's opposing separate statement "did not include reference to competent evidence," "made legal arguments that were not supported by evidence," and "was often not relevant to the undisputed fact, or it was, frankly, just incomprehensible." We agree. We give just one example.

PTI proffered the following fact (no. 18) as undisputed: "Pursuant to the terms of the Purchase Agreement, in or about November 10, 2015, PTI and T-Mobile entered into a Management Agreement (the 'Management Agreement'), which specifically applies to the relevant Site (referred to as DN01340A in the Management Agreement)." PTI supported the proffered fact by citing the following evidence: (1) the management agreement itself, and (2) a declaration from its general counsel stating the relevant site is identified in the management agreement as DN01340A. Exhibit A to the management agreement contains a list of "Non-Assignable Sites," and site DN10340A is on that list. In her opposing separate statement, Sinclaire stated fact No. 18 was "disputed," but she cited no evidence to support the dispute, and merely stated, in full: "DISPUTED IN UDF [i.e., undisputed fact] NO. 16 & 17. See Sinclaire's Response to PTI. No agreement would give other parties the right to use Sinclaire's property without changing the Lease. There are no Addendums of Waivers to the contract." To the extent Sinclaire incorporated her response to facts 16 and 17, we note she cited no evidence in response to those facts either.[9] And with no citation to any evidence, "it [was] impossible for [Sinclaire] to demonstrate the existence of disputed facts." (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.)

---

**9**     In her response to fact No. 16, Sinclaire noted, "PTI sent documents to the county with the number on the lease. SC55468 and SC55468A." Although she did not cite any evidence, this *may* refer to the footer on the site lease, which states, "Site Number: SC55468." Footer or no footer, however, Sinclaire cited no evidence to dispute PTI's proffered fact that the parties to the management agreement identified the site at issue in this case as DN01340A, and that site DN01340A was designated in the management agreement as a "Non-Assignable" site.

24

**C. Affirmative defenses in Sinclaire's answer and allegations in her cross-complaint**

Sinclaire notes the trial court did not mention her affirmative defenses in the judgment, and she states, "this is reversible error." She cites no legal authority to support this statement, and we may thus "treat the point as forfeited and pass it without consideration." (*Allen, supra*, 234 Cal.App.4th at p. 52.) We also reiterate what we stated above: "Plaintiff's *initial* burden of proof in moving for summary judgment … d[oes] not include disproving any affirmative defenses asserted by defendants." (*Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co., supra*, 170 Cal.App.4th at p. 564.) "Once the plaintiff … has met [its initial] burden, the burden shifts to the defendant … to show that a triable issue of one or more material facts exists as to the cause of action *or a defense thereto*." (§ 437c, subd. (p)(1), italics added.) "As the moving party, plaintiff [here PTI] had the initial burden to show it was entitled to judgment. [Citation.] Contrary to what [Sinclaire] appear[s] to argue, this burden did not include disproving [her] affirmative defenses. [Citation.] Once [PTI] met its initial burden, the burden shifted to [Sinclaire] to produce admissible evidence showing a triable issue of fact [regarding her affirmative defenses]." (*Santa Ana Unified School Dist. v. Orange County Development Agency* (2001) 90 Cal.App.4th 404, 411.) Thus, if Sinclaire "failed to produce any evidence as to [affirmative defenses] in [her] opposition papers," summary judgment for PTI was proper. (*Ibid*.) Here, Sinclaire fails to discuss or even mention any particular affirmative defense and fails to point to any admissible evidence submitted with her opposition papers that addressed her affirmative defenses. She thus fails to show a triable issue of fact exists as to those defenses or that the trial court committed reversible error by not addressing them.

Sinclaire also notes she "alleged" in her cross-complaint and her opposition papers that PTI and T-Mobile breached the lease. This is true, but, as noted, the party opposing a summary judgment motion "*shall not rely upon the allegations or denials of its*

*pleadings* to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto." (§ 437c, subd. (p), italics added.) A triable issue of material fact exists "if, and only if, *the evidence* would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 845, italics added.) Thus, it is not enough for Sinclaire to *allege* PTI and T-Mobile breached the lease; she must produce and identify *evidence* that would allow a reasonable trier of fact to find they breached the lease. She failed to do so.

### D. The gate and related issues

Sinclaire alleged in her cross-complaint that PTI and/or T-Mobile breached the lease by "installing an unauthorized gate" "at the ingress of [her] property, which is not located on the leased Site," and which "cut off" access to portions of property. Her brief contains several mentions of this alleged gate. As best we can discern, Sinclaire contends PTI and/or T-Mobile installed two gates on her property: one around the site itself, and one at the entrance to her property. The lease provides, "Tenant, at its expense, may use any and all appropriate means of restricting access to the Antenna Facilities, including, without limitations, the construction of a fence," and we thus presume Sinclaire does not complain about the placement of a fence and gate around the site itself. That leaves the second allegedly "unauthorized" gate. Sinclaire appears to contend one of the two gates was green and the other was gray and she complains "the court didn't know the difference." However, she cites nothing in the record that would help us understand the point she is trying to make. Perhaps she contends PTI and T-Mobile erected an authorized *gray* gate around the site, and an unauthorized *green* gate at the entrance to her property. If this is her contention, she cites no evidence to support it.

PTI and T-Mobile submitted color photographs that Sinclaire produced in response to interrogatories asking her to identify all documents that supported her

26

contention they breached the lease by installing an unauthorized gate. Most of the photographs appear to depict the cell tower and related equipment surrounded by a gray chain link fence and a locked gate. Two of the photographs depict a red and white "No Trespassing" sign with PTI's name on it, and the sign appears to be affixed to a green chain link fence. We cannot tell from the photographs of the no trespassing sign where it is located, and Sinclaire points to no evidence in the record that would explain what these photographs depict, and without such evidence, the photographs do not support her contention that PTI or T-Mobile (or anyone else) installed an unauthorized gate at the entrance to her property.

We note one of the exhibits Sinclaire submitted in opposition to the motion — exhibit M — includes a black and white photograph of a gate. We cannot tell from the photograph where the gate is located or what color it is. The trial court sustained PTI's objection to this exhibit, and as explained above, we thus cannot consider it. Moreover, even if the photograph had been admitted, Sinclaire (again) fails to point to any evidence that explains what it depicts, and without such evidence, it does not support her contention that PTI or T-Mobile installed an unauthorized gate at the entrance to her property.

Perhaps related to the gate issue, Sinclaire contends PTI and T-Mobile allowed third parties to access to her property and take her timber, which "was a clear violation of her property rights and … the Lease." The only thing she cites to support this contention is an allegation in her cross-complaint that PTI and T-Mobile breached the lease by "cutting timber or allowing the cutting of timber." Again, however, a party opposing a motion for summary judgment cannot rely on the allegations in the pleadings and must produce evidence that would allow a reasonable trier of fact to find PTI cut her timber or allowed others to do so. (§ 437c, subd. (p).) She fails to identify such evidence.

27

## E. Sinclaire's discussion of legal authority

Finally, Sinclaire complains the trial court based its ruling on "no law" and "tossed out the laws that Sinclaire had cited." Even a cursory review of the statement of decision shows it discussed the relevant law regarding summary judgment motions and each cause of action to which the motions were directed, and Sinclaire does not tell us what laws she cited that the trial court "tossed out."

Relatedly, we note the legal authorities Sinclaire cites in her brief are unaccompanied by any coherent explanation as to their relevance. For example, she cites "Siskiyou County Code Sub section 10-6.1518 Wireless Ordinance and the California Code of Regulations Title 14 Section 1270 Fire Safety Regulations." She then asserts, with no explanation, they "were violated" and "[t]hey state, '**Land use for cell towers cannot interfere with other land use in this case for rural land use**.'" Section 10-6.1518 of the Siskiyou County Code is titled "Wireless communications facilities," and it was enacted "to provide a uniform and comprehensive set of standards for the orderly development, operation, and maintenance of wireless communications facilities," but it does not contain the quote Sinclaire attributes to it (or anything like the quote).[10] Title 14, section 1270 of the California Code of Regulations does not exist. Assuming she meant to cite title 14, section 1270.00 of the California Code of Regulations, it provides, in full: "Subchapter 2 [of which section 1270.00 is a part] shall be known as the 'State Minimum Fire Safe Regulations,' and shall constitute the minimum Wildfire protection standards of the California Board of Forestry and Fire Protection." Subchapter 2 also

---

[10] The closest it comes to the quote is this: "Location of wireless communications facilities. Facilities shall be sited to avoid or minimize land use conflicts. None shall be cited in a location where it will unreasonably interfere with the operation of any County airport." (Siskiyou County Code, tit. 10, ch. 6, art. 15, § 10-6.1518, subd. (c).) To the extent Sinclaire contends the siting of the cell tower in this case creates land use conflicts, that begs the question of why she leased the site to T-Mobile to build and operate a cell tower.

28

does not contain the quote Sinclaire attributes to it (or anything like it). (See Cal. Code Regs., tit. 14, §§ 1270.00-1276.04.) She thus fails to explain how the Siskiyou County Code or the State Minimum Fire Safe Regulations have any relevance to this case. She also cites "Code SS 1276," which we have never heard of, and a federal regulation (47 C.F.R. § 1.1307) dealing with procedures for implementing the National Environmental Policy Act (NEPA), but with no explanation about how NEPA is relevant to the motions (and we note this is not a NEPA case). Again, "The mere assertion of a statutory … violation, followed by simply a citation to the statute … , does not merit a judicial response." (*Woods v. Horton, supra*, 167 Cal.App.4th at p. 677.)

Sinclaire also cites a United States Supreme Court case concerning the constitutionality of a state garnishment statute that notes, in passing, the importance of property rights (*Lynch v. Household Finance Corp.* (1972) 405 U.S. 538, 552), but she fails to explain how that case is relevant here. She cites two eminent domain cases (*San Diego Gas & Electric Co. v. Daley* (1988) 205 Cal.App.3d 1334 & *Zappavigna v. New York* (1992) 186 A.D.2d 557), but this is not an eminent domain case, and she again fails to explain how either case is relevant (and to the extent she cites these cases to demonstrate 5G reduces property values, we explain below why such a contention is not cognizable). She cites a jury instruction (CACI No. 323) entitled "Waiver of Condition Precedent," which instructs on the rule that "a plaintiff cannot recover on a contract without alleging and proving performance or prevention or waiver of performance of conditions precedent" (*Roseleaf Corp. v. Radis* (1953) 122 Cal.App.2d 196, 206), but she does not tell us how or why the concept of waiver of conditions precedent is relevant to this case. She also cites *Bonadelle Construction Co. v. Hernandez* (1959) 169 Cal.App.2d 396, 399, which deals with substantial performance, but, again, she does not tell us how or why this case is relevant. Finally, she cites *Fellom v. Adams* (1969) 274 Cal.App.2d 855, which deals with illegal contracts. It is unclear what contract — if any — Sinclaire contends is illegal, and it is thus unclear how *Fellom* is relevant to this

29

case.  As we have noted several times, "citing cases without any discussion of their application to the present case results in forfeiture." (*Allen, supra*, 234 Cal.App.4th at p. 52.)

Fellom does, however, bring up a related issue that may be relevant.  It teaches, " 'Where the illegality of a contract does not appear from the face of the complaint it becomes a matter of affirmative defense that must be specially pleaded.  And in such case the burden of proof is on the defendant' " to show illegality. (*Fellom v. Adams, supra*, 274 Cal.App.2d at p. 863.)  Here, no illegality appears on the face of any of the relevant contracts, and Sinclaire did not assert illegality as an affirmative defense to PTI's complaint.  She also did not allege illegality in her cross-complaint.  On a motion for summary judgment, however, " 'The pleadings delimit the issues to be considered … . [Citation.]' [Citation.]  Thus, a 'defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers.' [Citation.]  'To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.]  If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion.' " (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253.)  " ' " '[In] the absence of some request for amendment there is no occasion to inquire about possible issues not raised by the pleadings.' " ' " (*Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 365.) In their motions for summary judgment, PTI and T-Mobile thus only needed to address the issues raised by the pleadings.  Sinclaire did not allege illegality in her pleadings, she did not seek leave to amend her pleadings to raise illegality, and she thus may not defeat the motions by raising illegality.

In the same vein, we note Sinclaire mentions 4G, 5G, and EMFs several times in her brief, albeit with very little explanation.  She appears to contend that PTI and/or T-

30

Mobile have put 4G and 5G antennas on the cell tower without her consent, which increases the electromagnetic fields (or EMFs) emitted, which some people believe are unsafe, and which, as a result, has reduced the value of her property and/or made it more difficult to sell.  Whatever the merits of this contention, Sinclaire's pleadings contain no mention of 4G, 5G or EMFs, and she thus "cannot bring up [these] new, unpleaded issues" in order to defeat the summary judgment motions, nor can we consider these issues on appeal.  (*Laabs v. City of Victorville, supra*, 163 Cal.App.4th at p. 1253.)

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)


/s/ _____
EARL, P. J.

We concur:


/s/ _____
RENNER, J.


/s/ _____
FEINBERG, J.

31